1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  BEATRIZ ALDAPA and ELMER                No.  1:15-cv-00420-DAD-SAB
    AVALOS, on behalf of themselves and
12  others similarly situated,

13              Plaintiffs,                  ORDER GRANTING MOTION FOR CLASS
                                            CERTIFICATION IN PART AND DENYING
14      v.                                  MOTION FOR TRIAL PLAN

15  FOWLER PACKING COMPANY, INC., a         (Doc. Nos. 145, 149)
    California corporation; AG FORCE LLC, a
16  California limited liability company;
    FOWLER MARKETING
17  INTERNATIONAL LLC, a California
    limited liability company; and DOES 1–10,
18
                Defendants.
19

20          This wage-and-hour class action suit was initially filed by plaintiffs in this court on March

21  17, 2015 (Doc. No. 2), and currently proceeds on plaintiffs' first amended complaint ("FAC")

22  filed on October 20, 2016 (Doc. No. 129).  On February 3, 2017, plaintiffs filed a motion to

23  certify one main class and thirteen subclasses.  (Doc. No. 145.)  A hearing on the motion was held

24  May 17, 2017, following which the court ordered additional briefing, which the parties timely

25  submitted.  (Doc. Nos. 171, 178, 181, 183.)  At the hearing, attorneys Mario Martinez, Ira

26  Gottlieb, and Dexter Rappleye appeared on behalf of plaintiffs and the prospective class.

27  Attorneys Howard Sagaser and Ian Wieland appeared on behalf of defendants.  Following

28  supplemental briefing by the parties, the matter was taken under submission for decision.  For the

reasons set forth below, the court will grant the motion for class certification in part.

**BACKGROUND**

This lawsuit stems from a variety of alleged state and federal labor law violations by defendants, who employ seasonal workers for a variety of tasks necessary in commercial agricultural operations. Some of the farms on which the agricultural workers are employed are owned by defendants, while others are owned by third-party growers who contract with defendants to provide a labor force. Defendant Fowler Packing is a commercial grower, packer, and shipper of various fruits, while defendant Ag Force is a farm labor contractor. Defendant Fowler Marketing International is responsible for marketing and selling the crops owned by Fowler Packing and harvested by the employees of Ag Force. These three corporate entities are all owned by Grant Parnagian and members of the Parnagian family.

In their FAC, plaintiffs allege twelve separate claims: (1) violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.* for failing to pay all wages due or provide necessary tools; (2) failure to compensate for rest breaks in accordance with California Labor Code § 226.7[1] and Wage Order 14; (3) failure to pay all wages due under the employment contract by requiring off-the-clock work and allowing the use of "ghost workers"; (4) failure to pay overtime, as required by state law; (5) failure to pay the minimum wage, in violation of Labor Code § 1194; (6) failure to pay waiting time penalties in violation of Labor Code § 203; (7) failure to provide necessary tools or reimburse for tools in violation of Labor Code § 2802; (8) violations of California Business and Professions Code § 17200 by underpaying workers, failing to provide rest periods, and retaining the benefits of the labor without reasonable compensation; (9) violations of Labor Code § 226 by failing to keep accurate records or provide accurate statements to the employees; (10) failure to record and/or pay for travel time and wait time, in violation of Labor Code § 1194 and 29 U.S.C. § 1801, *et seq.*; (11) failure to reimburse for vehicle expense, in violation of Labor Code § 2802; and (12) failure to provide meal periods
/////

---

[1] All subsequent references to the "Labor Code" are to the California Labor Code.

and keep accurate records of meal periods, in violation of Wage Order 14 and 29 U.S.C. § 1801, *et seq.*

Plaintiffs seek certification of the following class[2] and thirteen subclasses:

**Main Class**

All individuals who have been employed, or are currently employed, by Defendants Ag Force, LLC, Fowler Packing, Co. and/or Fowler Marketing, Int'l. as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, excluding supervisors, "swampers," office, clerical, or other non-agricultural workers.

*Subclasses*

1. <u>Piece Rate Rest Period Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, who worked on a piece rate basis at any time from March 17, 2011 up to the present, and were not separately compensated for rest periods during their piece rate shifts.

2. <u>Ghost Worker Crew Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked on a crew piece rate basis and were not compensated properly due to the inclusion of payments to ghost workers in their crew(s).

3. <u>Unpaid Travel Time Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked at two or more fields in one day but were not compensated for their time spent travelling between fields.

4. <u>Waiting Time Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who spent time waiting before harvest work would commence and were not paid for that waiting time.

_____

[2] The court will review each subclass individually to determine whether it meets the requirements of Rule 23. Further, the plaintiffs have not indicated that there are any members of the main class that do not fall within one of the subclasses. Therefore, the court will decline to certify the main class and will instead certify the subclasses individually as determined appropriate. *See, e.g.*, *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2016 WL 8933624, at *11–12 (N.D. Cal. Aug. 22, 2016) (certifying subclasses but declining to certify main class); *Evans v. Linden Research, Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *10, 19 (N.D. Cal. Nov. 20, 2012) (same); *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 596 (S.D. Cal. 2010) ("Because the Court certifies only the Plan 3 Subclass, it need not certify an overarching main class at this time.").

5. <u>Pre-Shift Work Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work before the fixed start time of a daily shift.

6. <u>Post-Shift Work Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who performed uncompensated and unrecorded work after the fixed end time of a daily shift.

7. <u>Tools Subclass</u>: All individuals who have been employed, or currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who incurred unreimbursed tool expenses while working for Defendants.

8. <u>Meal Period Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who did not receive a meal period and/or for whom a meal period was not recorded.

9. <u>Inaccurate Wage Statement Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who due to the violations claimed herein (other than the violations in subclasses 4 and 8), received an inaccurate itemized wage statement.

10. <u>Vehicle Expense Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who worked at two or more fields in one day and drove their own cars between fields but were not reimbursed by Defendants for their vehicle expenses.

11. <u>AWPA Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were not provided employment consistent with the terms of the "working arrangements" made with them by Defendants.

12. <u>Section 17200 Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March 17, 2011 up to the present, who, due to the violations claimed herein, were employed under "unlawful, unfair, or fraudulent business acts or practices."

13. <u>Final Paycheck Subclass</u>: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt "field worker" or agricultural worker, any time from March

4

17, 2011 up to the present, who were not paid all wages due when
they were laid off each season, discharged, or quit, as required by
the California Labor Code.

(Doc. No. 145 at 2–5.)

## LEGAL STANDARDS

### A.     Pertinent Class Action Law

The class action is a procedural mechanism whereby the "usual rule that litigation be

conducted by and on behalf of the named parties only" is swept aside so that multiple parties—

unwieldy in number but possessing similar or identical claims—may pursue common redress in

an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-

Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)); *see also Abdullah v. U.S. Sec. Assocs.,

Inc.*, 731 F.3d 952, 963–64 (9th Cir. 2013). Federal Rule of Civil Procedure 23 controls class

certification and imposes a two-step process designed to ensure not only that this system of

representative adjudication nets expediencies for the litigants and the judiciary, but that it does

not sacrifice procedural fairness or zealous advocacy in the process of doing so.

Rule 23(a) is the first hurdle that must be overcome for a case to proceed as a class action.

It consists of four prerequisites, often described as: (1) numerosity, (2) commonality, (3)

typicality, and (4) adequacy. If—and only if—a putative class satisfies these four requirements

may it then proceed to show it also satisfies one of the three subsections of Rule 23(b). The party

seeking class certification bears the burden of establishing conformity with these requirements,

and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted.

*Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 350. A court must review the merits of a party's

substantive claim to the extent that they overlap with issues touching on class certification. *Ellis

v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing *Dukes*, 564 U.S. at 350–51

and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)); *see also Blair v. The CBE

Grp., Inc.*, 309 F.R.D. 621, 625 (S.D. Cal. 2015). Only after it has conducted a "rigorous

analysis" of these facts and determined they show "actual, [and] not presumed, conformance"

with Rule 23(a) and (b), may a district court certify a class. *Ellis*, 657 F.3d at 981 (quoting *Gen.

Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 161, (1982)); *see also Comcast*, 569 U.S. at 33–34

5

(extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Servs., Inc.*, Case No. 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b)."). If a court does decide to certify a class, it must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

Individualized defenses may be relevant to a court's determination of whether to allow certification of certain class claims. *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir. 2015); *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) ("The existence of affirmative defenses which require individual resolution can be considered as part of the court's analysis to determine whether individual issues predominate under Rule 23(b)(3).") (footnote omitted); *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 629–30 (D.N.M. 2007) ("While the existence of affirmative defenses that may require individualized evidence does not compel a finding that individual issues predominate over common ones, it does weigh against class certification."). "When defendants opposing class certification raise a legal defense that may defeat commonality, the district court cannot assume its validity but should make a threshold determination on the legal merits." *Edwards*, 798 F.3d at 1184. While the court need not take evidence on any of the defenses, if the defense is invalid as a matter of law, it will not defeat certification. *Id.* Further, the need for individualized assessments of damages will not defeat class certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013); *see also Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("[D]amage calculations alone cannot defeat certification.").

"When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). If subclasses are required because of conflicts between the various class members and the inability of either class counsel or class representatives to adequately represent the subclass, "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981). *See* 5 Newberg on Class Actions § 7.29 (differentiating between compulsory subclasses and permissive subclasses for management purposes). *But see Am. Timber & Trading Co. v. First Nat'l Bank of Oreg.*, 690 F.2d 781, 787 n.5 (9th Cir. 1982)

(concluding that because subclassing was permissive under Rule 23(d), it need not be evaluated separately for commonality, numerosity, typicality, and adequacy).

Subclasses may be used to more efficiently resolve common issues during the proceeding and at trial. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1123–24 (9th Cir. 2010) ("To the extent there may be any concern that the differing statutes . . . will render class adjudication of class members' claims impractical or undermine effective representation of the class, it may counsel the formation of subclasses."); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997) (subclasses allow courts to focus discovery, dismiss individual claims as necessary, and conduct trial in a more orderly manner). Absent conflicts of interest between subclasses, however, there is no rule that separate subclasses are required for each of cause of action in order for plaintiffs to satisfy their burden on class certification. *See, e.g.*, *In re VMS Sec. Litig.*, 136 F.R.D. 466, 477–78 (N.D. Ill. 1991) ("[T]he court will not require separate subclasses for the various federal securities fraud claims."); *cf. Unicorn Field, Inc. v. Cannon Grp., Inc.*, 60 F.R.D. 217, 226–27 (S.D.N.Y. 1973) (requiring separate subclasses for different causes of action when they proceed on distinct legal theories and requirements of proof). *See also Norwood v. Raytheon Co.*, 237 F.R.D. 581, 589 n.14 (W.D. Tex. 2006) (where subclasses are based on causes of action involving substantially similar claims, no separate analysis of subclasses is required).

## B. Rule 23(a) Requirements

In order for a class member to sue as a representative of all class members, the class member must establish the following prerequisites: (1) the class must be "so numerous that joinder of all members is impracticable"; (2) there must be "questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These prerequisites are typically referred to as numerosity, commonality, typicality, and adequacy of representation.

### 1. Numerosity

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity has no strict limit, but certainly class membership in the

hundreds is sufficient to meet it.  *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 449

(E.D. Cal. 2013) (numerosity met with approximately 3,500 class members); *Orvis v. Spokane*

*County*, 281 F.R.D. 469, 473 (E.D. Wash. 2012) (numerosity met with 260 class members);

*Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 594 (E.D. Cal. 2008)

(approximately one thousand members satisfied numerosity).

### 2.    Commonality

Rule 23 requires there be "questions of law or fact common to the class."  Fed. R. Civ. P.

23(a)(2).  To satisfy Rule 23(a)'s commonality requirement, a class claim "must depend upon a

common contention . . . of such a nature that it is capable of class[-]wide resolution—which

means that determination of its truth or falsity will resolve an issue that is central to the validity of

each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  As the Supreme Court further

explained, this frequently necessitates an inquiry that "overlap[s] with the merits of plaintiff's

underlying claim."  *Id.* at 351.

### 3.    Typicality

"[T]he claims or defenses of the representative parties [must be] typical of the claims and

defenses of the class."  Fed. R. Civ. P. 23(a)(3).  They need not be clones; rather, all that is

required is that the claims or defenses be "reasonably co-extensive."  *Hanlon*, 150 F.3d at 1020

(noting that this standard is a "permissive" one and requires only that the claims of the class

representatives be "reasonably co-extensive with those of absent class members; they need not be

substantially identical").  Typicality is satisfied if the representative's claims arise from the same

course of conduct as the class claims and are based on the same legal theory.  *See, e.g., Kayes v.*

*Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (claims are typical where named plaintiffs

have the same claims as other members of the class and are not subject to unique defenses).  "The

test of typicality is whether other members have the same or similar injury, whether the action is

based on conduct which is not unique to the named plaintiffs, and whether other class members

have been injured by the same course of conduct."  *Hanon*, 976 F.2d at 508.

/////

/////

### 4. Adequacy of Representation

Plaintiffs seeking class certification must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020)); s*ee also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015). "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. W. Publ'g Co.*, 563 F.3d 948, 959 (9th Cir. 2009) (citing *Hanlon*, 150 F.3d at 1020). Accordingly, "[c]lass certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members." *Allied Orthopedic v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007). Generally, the adequacy inquiry seeks to ensure that the class representative is "part of the class and [that he] possess[es] the same interest and injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

### C. Rule 23(b) Requirements

Once the prerequisites of Rule 23(a) are met, the court must certify the class under one of the Rule 23(b) categories. Certification under Rule 23(b)(3) is permitted when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is [deemed to be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (quoting Fed. R. Civ. P. 23(b)(3)); *see also Tyson Foods, Inc. v. Bouaphakeo*, ___U.S. ___, ____, 136 S. Ct. 1036, 1045 (2016) ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'") (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)). "The Rule 23(b)(3) predominance inquiry tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 622, whereas the superiority requirement demands courts "assess the relative advantages of alternative procedures for handling the total controversy" in order to determine that "a class action is the 'superior' method of resolution." Fed. R. Civ. P. 23(b)(3) advisory comm. note; *see also Pointer v. Bank of Am. Nat'l Ass'n*, No. 2:14-cv-0525-KJM-CKD, 2016 WL 696582, at *8 (E.D. Cal. Feb. 22, 2016). While the predominance requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis. *Dukes*, 564 U.S. at 359; *Amchem*, 521 U.S. at 624–25; *Hanlon*, 150 F.3d at 1022. Ultimately, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting Newberg, § 4:49, at 195–96).

Rule 23 provides that, aside from predominance, a court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule lists four metrics pertinent to superiority, including class members' interests in individually controlling litigation, whether any litigation has already been filed by putative class members, the desirability of concentrating the litigation in a class action, and the "likely difficulties in managing a class action." *Id.* The Ninth Circuit has recognized a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns," but rather should look to "manageability as one component of the superiority inquiry." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015)).

## ANALYSIS

### A. Standing to Seek Injunctive Relief

Based upon the parties' submissions, it is apparent that the named plaintiffs no longer work for defendants. Plaintiff Aldapa left the company in May 2015, shortly after this lawsuit was filed. (Doc. No. 145-6 at 94.) Plaintiff Avalos, left the defendants' employment in early 2014. (*Id.* at 106–07.) At the court's request, the parties provided supplemental briefing concerning the named plaintiffs' standing to seek injunctive relief and their ability to seek

certification under Rule 23(b)(2).

Plaintiffs concede that an employee typically does not have standing to seek injunctive relief against a former employer. *See Dukes*, 564 U.S. at 365 (noting that employees who left employment after the filing of a complaint have "no more need for prospective relief than those who left beforehand"); *Ellis*, 657 F.3d at 988; *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006). Nevertheless, plaintiffs advance two arguments in support of their claim of standing to seek injunctive relief here: (1) that at least one named plaintiff intends to seek reinstatement, should the alleged violations of labor law cease; and (2) that the federal statute under which plaintiff is suing—29 U.S.C. § 1854—has expanded the concept of standing in the particular case of seasonal agricultural employees to allow injunctive relief to be afforded to prior employees. The undersigned finds neither of these assertions to be persuasive.

### 1. Potential for Reinstatement

As plaintiffs note, there is an exception from the standard rule that former employees lack standing to seek injunctive relief from their former employers. A former employee who is "in the process of seeking reinstatement to their former positions, or seeking work from that employer" may have standing to bring a claim for injunctive relief. *Walsh*, 471 F.3d at 1037 (citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) and *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981)); *see also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017). However, upon review none of these decisions support plaintiffs' standing to seek injunctive relief here. In *Freitag*, the plaintiff was actively pursuing reinstatement. 468 F.3d at 547 (noting that, when the injunction was issued, plaintiff "was still in the process of pursuing her state administrative appeal [of a termination decision] in which she maintains that she is entitled to retain her position as a correctional officer at Pelican Bay"). In *Nanty*, the court did state that "[w]hen a legitimate candidate for a job has demonstrated that he has been the subject of unlawful discrimination in the employment process, he is entitled to an injunction against future, or continued, discrimination." 660 F.2d at 1333, *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996). However, the Ninth Circuit has subsequently explained that the injunction in *Nanty* was upheld "in part because the question whether the

plaintiff was entitled to the job he sought had not been finally resolved and, thus, he retained a personal interest in ensuring that the company's discriminatory activity be enjoined." *Freitag*, 468 F.3d at 548.

Here, plaintiff Avalos declares that, while he left his position with defendants due to the numerous employment law violations he observed, he would "consider seeking reinstatement with the company" if those violations were appropriately addressed. (Doc. No. 145-6 at 106–07.)[3] Nothing indicates plaintiff Avalos is actually seeking reinstatement by the defendants. *See Jadwin v. County of Kern*, No. 1:07-cv-00026-OWW-DLB, 2009 WL 2424565, at *8 (E.D. Cal. Aug. 6, 2009) (injunctive relief was moot where plaintiff was not seeking reinstatement and there was no "reasonable likelihood" he would resume employment). Nor does this case relate to plaintiff Avalos's unlawful discharge or a discriminatory failure to hire him. Rather, he affirmatively resigned from his employment with defendants. Finally, even the statement Avalos does make regarding resuming employment with defendants is equivocal: he would merely "consider" seeking reinstatement if a variety of allegedly unlawful payment practices are remedied. While it is unclear whether plaintiffs are required to seek reinstatement as a legal remedy of the suit in order to seek injunctive relief, merely considering reinstatement if certain remedial actions come to fruition is insufficient to fit within this exception. Since plaintiff Avalos has not demonstrated a cognizable legal interest in defendants' future employment practices, he lacks standing to seek injunctive relief.

### 2.    Expanded Standing Under 29 U.S.C. § 1854

Plaintiffs also argue that "[p]articularly in the case of agricultural workers, there is a presumption that former employees may establish a real and immediate threat of continuing or future injury despite their fluctuation between employee and non-employee status during the course of litigation." (Doc. No. 178 at 10.) According to plaintiffs, the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") allows anyone "aggrieved" by the employer's failure to discharge its lawful responsibilities to bring suit, even non-employees. (*Id.*) Therefore,

---

[3]  Plaintiff Aldapa has not indicated she would consider returning to work for defendants.

they assert, as the named plaintiffs in this action they "are entitled to a presumption that as seasonal, agricultural employees they and similarly-situated class members are likely to return to work as employees of Defendants in the future." (*Id.* at 11–12.)

The Supreme Court has held a plaintiff suffers an "injury-in-fact" for the purposes of standing when Congress provides a statutory cause of action. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 521–23 (2007) (finding the State of Massachusetts had standing based on the Clean Air Act); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–85 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (finding injury in fact under the Clean Water Act)); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21–25 (1998) (finding standing when plaintiff was deprived of the statutory right to obtain information). *But see Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 973 (9th Cir. 2015) (noting Congress may enact statutes creating a private cause of action, absent which no injury would exist, but may not "create injury in fact by legislative fiat"). However, a plaintiff must also establish standing for each type of relief sought. *Summers*, 555 U.S. at 493; *Friends of the Earth, Inc.*, 528 U.S. at 185.

The AWPA permits "[a]ny person aggrieved by a violation of this chapter" to bring suit in a district court. 29 U.S.C. § 1854(a). Plaintiffs point to several court decisions in which certification of a class seeking injunctive relief under Rule 23(b)(2) has been permitted, despite the fact that violation was not presently occurring. *See Siquic v. Star Forestry, LLC*, No. 3:13cv00043, 2016 WL 1117627, at *6 (W.D. Va. Mar. 17, 2016); *Roman v. Korson*, 152 F.R.D. 101, 109 (W.D. Mich. 1993) (allowing injunctive relief where evidence showed migrant workers would return to the same housing in future years, because there was "a reasonable likelihood that violations will occur in the future"); *Saintida v. Tyre*, 783 F. Supp. 1368, 1376 n.7 (S.D. Fla. 1992); *Fields v. Luther*, No. JH-84-1875, 1988 WL 59963, at *21–22 (D. Md. May 4, 1988). Of these decisions, only one—*Roman*—concerned a motion for class certification; the others that were class actions involved cases in which a class had already been certified. Moreover, because

13

it was decided in 1993, the court in *Roman* could not have considered more recent precedent finding injunctive relief unavailable for classes of prior employees. *See Dukes*, 564 U.S. at 365 (noting with approval the Ninth Circuit's recognition that "plaintiffs no longer employed by Wal–Mart lack standing to seek injunctive or declaratory relief against its employment practices"); *Munoz v. Giumarra Vineyards Corp.*, No. 1:09-cv-00703-AWI-JLT, 2012 WL 2617553, at *35 (E.D. Cal. July 5, 2012), *findings and recommendations adopted*, 2013 WL 2421599 (declining to certify a class under Rule 23(b)(2) where the class contained employees who no longer worked for defendant).

This court is not unsympathetic to the unique and myriad difficulties facing seasonal agricultural workers who attempt to vindicate their rights under applicable labor law. However, the named plaintiffs' absence from employment here is not apparently based on the seasonal ebb-and-flow of the work which might warrant an expanded application of standing principles in this case. Instead, neither named plaintiff has worked for defendants in multiple years, nor do they show any sign of returning to defendants' employment. Nor is this a case where plaintiffs have shown that some malfeasance or retaliatory interest on the part of their employer was what caused their termination or prevented them from being rehired, or that they seek to be rehired as part of the relief afforded by this lawsuit. Rather, the named plaintiffs have not indicated they are seeking reinstatement or are actively pursuing employment with the defendants. In short, plaintiffs have presented no persuasive argument that the AWPA expands standing sufficiently to afford them the opportunity to seek injunctive relief here. Since the plaintiffs lack standing to

/////

/////

/////

/////

/////

/////

/////

/////

pursue their claims for injunctive relief,[4] the court will deny plaintiffs' request to certify any of the subclasses under Rule 23(b)(2) for the purposes of seeking injunctive relief.[5]

### B.      Adequacy of Class Representatives and Class Counsel

As noted above, adequacy of the class representatives and class counsel must be determined for each of the classes and subclasses to be certified.  Unlike factors such as commonality, typicality, and predominance, however, adequacy of representation can be addressed collectively, as the class representatives and class counsel remain the same for each subclass.

Defendants have attacked, at length, the adequacy of one of the anticipated class counsel and of both the named plaintiffs to represent the class.  (Doc. No. 147 at 24–32.)  Defendants' arguments in this regard are addressed in turn below.

a.      Plaintiff Avalos

Both plaintiffs declare they wish to serve as a class representative in this action.  (Doc. No. 145-6 at 93, 106.)  Both represent to the court that they have participated in numerous meetings with their attorneys, have communicated with other workers about this action, and have reviewed documents and policies with their attorneys.  (*Id.* at 93, 106.)  Plaintiffs Aldapa and

---

[4]  The same standing concerns do not impact the named plaintiffs' ability to seek damage for a class period beyond the time in which they were employed by defendants.  A plaintiff must establish standing for each type of relief sought.  *Summers*, 555 U.S. at 493; *Friends of the Earth, Inc.*, 528 U.S. at 185.  Plaintiffs clearly have standing to seek monetary redress.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding the "irreducible constitutional minimum of standing" requires injury in fact, a causal connection to the conduct complained of, and the likelihood of redressability by a favorable decision).  Plaintiffs here have identified various injuries they suffered due to labor law violations by the defendants, which are likely to be remedied by an award of damages.  The named plaintiffs need not be identically situated to bring the claims of other class members, but need only have claims that are "reasonably co-extensive." *See Hanlon*, 150 F.3d at 1020; *Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1175 (9th Cir. 1990).  Therefore, plaintiffs may represent a class seeking damages, even if the class period extends beyond the period of their employment with defendants.

[5]  In the event the court rejected their arguments with respect to standing to seek injunctive relief, plaintiffs have requested leave to amend the complaint to add named plaintiffs that do have standing to seek such injunctive relief.  (Doc. No. 178 at 12.)  Defendants indicate they would oppose any such request.  (Doc. No. 181 at 12–14.)  Motions for leave to amend the complaint and any motion to amend this class certification order may be filed and noticed on the court's calendar pursuant to Local Rule 230.

Avalos have already been deposed by defense counsel, and attended a mediation in San Francisco concerning the case. (*Id.*) Additionally, both state that they are aware of no conflicts preventing them from serving as class representatives, have neither business nor personal relationships with class counsel, and intend to continue prosecuting this action until its resolution. (*Id.*)

The court struggles to understand what genuine objections defendants have to plaintiff Avalos serving as a class representative. Defendants in large part[6] appear to argue that, because Mr. Avalos made changes to his deposition transcript which were significant enough to warrant the reopening of his deposition, this demonstrates "the lack of credibility of Mr. Avalos." (Doc. No. 147 at 29.) According to defendants, "based on that fact [the reopening of the deposition] alone, Mr. Avalos should not be allowed to serve as a class representative." (*Id.*)

Defendants cite one case for the proposition that a court may find a plaintiff to be an inadequate class representative if it finds his testimony lacks "credibility." (Doc. No. 147 at 24–25) (citing *CE Design Ltd. v. King Arch. Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011). Even within the decision in the cited case—which involved potential affirmative, systematic misrepresentations being made by the sole named plaintiff, who had filed at least 150 class actions under the same federal law—the Seventh Circuit cautioned against an over-reading of its decision when it remanded the case for a further credibility evaluation:

> We don't want to be misunderstood, however, as extending an invitation to defendants to try to derail legitimate class actions by conjuring up trivial credibility problems or insubstantial defenses unique to the class representative. Serious challenges to typicality and adequacy must be distinguished from petty issues manufactured by defendants to distract the judge from his or her proper focus under Rule 23(a)(3) and (4) on the interests of the class.

*Id.* at 728.

/////

---

[6] Defendants also assert various facts about plaintiff Avalos—that he worked for Ag Force from 2012 to March 22, 2014 under foreperson Elpidio Torres, that he pruned and thinned peach and nectarine trees, that he picked mandarins, and that he did not harvest grapes or tree fruit—but present neither argument nor explanation as to why these allegations are relevant to this inquiry. (Doc. No. 147 at 29–30.) Because it is not apparent to the court why these facts should disqualify plaintiff Avalos from serving as a class representative, the court delves no further into defendants' assertions.

16

Defendants point to various aspects of the deposition testimony given by plaintiff Avalos in arguing that he lacks "standing"[7] to pursue class claims. (Doc. No. 147 at 29–30.) In this regard, plaintiff Avalos testified at deposition that, while he was supposed to be paid on a piece-rate basis for the mandarin harvesting, he was in fact paid hourly. (Doc. No. 147-2 at 5–9.) He also testified that he believed the crew boss was "doing something illegal," but only testified about the practices on his crew. (*Id.*) He later testified that his understanding of the way the ghost workers affected him was that he had to perform more work in order to compensate for these workers, as opposed to being deprived of wages. (*Id.* at 11.) According to plaintiff Avalos, he was paid for all of the hours he worked. (*Id.* at 11–13.) Additionally, he testified he never worked overtime, and "sometimes" got rest breaks, seemingly once a day. (*Id.* at 13, 15.) After noting his testimony on these points defendants then baldly assert, without explanation, "[c]learly, based on Plaintiff Avalos [sic] own testimony, he lacks standing." (Doc. No. 147 at 30.)

This appears to be the type of manufactured trivial credibility issue which the Seventh Circuit warned that courts should not be distracted by. Most of the changes to plaintiff Avalos's deposition testimony reflect his desire to correct his testimony about not being paid on a piece rate basis to accurately reflect that he was not paid *properly* on a piece rate basis. (Doc. No. 54-1.) Plaintiff Avalos explained that he misunderstood these questions when put to him at his deposition and had assumed that because the crew bosses did not accurately account for his piece rate wages, he was being paid on an hourly basis. (*Id.*) Defendants do not argue that these are "sham corrections," *i.e.*, corrections designed to create a material dispute of fact where there otherwise is none. *See Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 901 (N.D. Cal. 2016). Plaintiffs' counsel notes these corrections by Avalos to his deposition testimony were

---

[7] The invocation of standing in this context makes little sense. Standing is an Article III concern that exists in class actions similar to regular actions. *See, e.g.*, *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 230–31 (C.D. Cal. 2003). It is analyzed separately from the adequacy of a named plaintiff to represent the class. *See id.* at 230–31, 235–36 (treating standing and adequacy as separate inquiries). Plaintiff Avalos both alleged in the complaint and declares in his affidavit that he was subject to numerous illegal employment practices. He clearly has standing to pursue his claims against defendants. Whether he is an adequate class representative is a separate matter.

made necessary by "defense counsel's use of ambiguous, vague questions that contained legal terminology or sought legal conclusions from Plaintiff [Avalos], a farmworker with no legal training and little formal education." (Doc. No. 150 at 13, n.4.) Further, according to plaintiffs' counsel, plaintiff Avalos does not speak English, "and the interpreter strained to translate defense counsel's legal terms of art into Spanish." (*Id.*) It is not surprising that a layman in these circumstances might have an imperfect understanding of the accurate answers to such questions. These corrections to his deposition testimony do nothing to undermine plaintiff Avalos's credibility as a class representative, which primarily requires that he not have a conflict of interest and is willing to vigorously prosecute the action on behalf of the class. *Ellis*, 657 F.3d at 985.[8] If anything, they bolster his credibility, since providing corrections to deposition testimony is the appropriate course of action with respect to any misstatements. *See* Fed. R. Civ. P. 30(e)(1). Plaintiff Avalos will be confirmed as a class representative for each of the subclasses certified below.

   b. <u>Plaintiff Aldapa</u>

   Defendants' arguments against plaintiff Aldapa's ability to serve as an adequate class plaintiff are likewise unpersuasive. Defendants argue that plaintiff Aldapa too met with class counsel and other potential class plaintiffs. As already stated herein, the court finds that the act of meeting with one's attorney and co-plaintiffs is in no way salacious and does not impugn Aldapa's credibility or call into question her adequacy as a class representative. As with respect to plaintiff Avalos, the court is unclear what defendants intended to imply by listing numerous facts about plaintiff Aldapa without explaining their relevance. (Doc. No. 147 at 30–31) (noting plaintiff Aldapa only worked on one crew; that crew had at least three different forepersons; that

---

[8] Defendants also attack plaintiff Avalos's credibility on two other grounds, which deserve only the briefest of mentions. First, according to defendants, Avalos should be barred from serving as class representative because he provided different estimated prices for tools at his deposition than he did in his declaration supporting class certification. (Doc. No. 147 at 24–25.) This contention is of no consequence here, and is summarily rejected. Second, defendants repeat their frequent refrain that Avalos's role is suspect because of his participation in group meetings with counsel at the UFW facilities. (Doc. No. 147 at 30; *see also* Doc. Nos. 98, 116.) The act of meeting with other potential class action plaintiffs and the attorney who was seeking to serve as class counsel in no way impugns Avalos's credibility.

the only time she knew of a foreperson using ghost workers was under Ramon Murillo; that Aldapa was paid piece rate at times and hourly at other times; Aldapa "admitted" during her deposition that she did not like the company-issued scissors and purchased her own, and knew her foreman was charging for gloves without defendants' knowledge but did not report it).

Defendants present no salient reason why plaintiff Aldapa is unqualified to serve as a class representative.[9]  Ms. Aldapa avers in her declaration that she has no conflicts of interest and will vigorously prosecute the action.  (Doc. No. 145-6 at 93.)  These representations are sufficient to meet the general criteria for serving as a class plaintiff.  *Ellis*, 657 F.3d at 985.  Therefore, plaintiff Aldapa will be confirmed as a class representative for each of the subclasses certified below, with the exception of the Vehicle Expense Subclass.

c.     <u>Class Counsel</u>

Plaintiffs seek appointment of both Martinez, Aguilasocho, & Lynch APLC ("MAL") and Bush Gottlieb as class counsel, and provide detailed information concerning the qualifications of various attorneys working for each law firm.  Mario Martinez, one of the putative class's proposed attorneys, declares he graduated from the University of California at Berkeley's School of Law and has been licensed to practice law since 1999.  (Doc. No. 145-1 at ¶ 7.)  He worked with Camacho Law from 1998 to March 2015, at which point he formed the firm Martinez, Aguilasocho, & Lynch APLC ("MAL").  (*Id.*)  Attorney Martinez is fluent in Spanish and grew up working in the grape fields as a child, giving him a unique appreciation for the work performed by his clients.  (*Id.*)  During his more than fifteen years of work at Camacho Law, he represented farm workers and other low-income workers in complex class actions in both the state and federal courts in California.  (*Id.* at ¶ 8.)  Camacho Law has represented low-income agricultural workers who worked with many different crops in California, Florida, Washington, Oregon, and other states, and primarily worked in labor and employment law to assist in

---

[9]  Defendants' argument that plaintiff Aldapa cannot be a representative for the Vehicle Expense Subclass (Doc. No. 147 at 31) is superfluous.  It is true that a named plaintiff can only function as a representative for absent class members bringing claims she herself has standing to bring. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001).  However, plaintiffs acknowledged as much in their moving papers and never sought to have plaintiff Aldapa represent that subclass.  (*See* Doc. No. 145 at 34, n. 41.)

enforcing the rights of Spanish-speaking farm workers, which is the same practice area upon which MAL now focuses. (*Id.* at ¶¶ 7–9.) According to attorney Martinez, he is also the general counsel for the United Farm Workers ("UFW"). (*Id.* at ¶ 8.) Attorney Martinez has also provided the qualifications for the other partners at his firm, Thomas Lynch and Edgar Aguilasocho, as well as an associate who is working on the case, Margaret Serrano. (*Id.* at ¶¶ 10–11.) Attorney Martinez lists thirteen class actions which the attorneys for his firm have worked on. (*Id.* at ¶ 12.)

Attorney Ira Gottlieb declares he has been licensed in California since 1982, and in New York since 1981, having received a J.D. in 1980 from Rutgers University. (Doc. No. 145-2 at ¶ 2.) He has worked as a labor attorney for more than 35 years, and previously served as counsel to the UFW. (*Id.* at ¶ 3.) Attorney Gottlieb notes he has worked on numerous labor law class actions as lead counsel, and lists many of them. (*Id.* at ¶¶ 4–6.) He also notes the qualifications of the other attorneys from Bush Gottlieb working on this case, Erica Deutsch and Dexter Rappleye. (*Id.* at ¶¶ 7–8.)

Defendants' sole argument about the adequacy of class counsel consists of contesting attorney Mario Martinez's ability to serve in that role. No other arguments are raised concerning other attorneys from MAL or Bush Gottlieb. Defendants assert attorney Martinez and MAL are prohibited from representing the class because of the "apparent conflict of interest" between Martinez's role in this case and as general counsel for the UFW. (Doc. No. 147 at 25.) Defendants state that they "are informed and believe the UFW threatened to oppose AB 1513 [the safe harbor bill] because Mr. Martinez stands to earn substantial attorneys' fees should this case be certified as a class action and the class plaintiffs ultimately prevail." (*Id.*) According to defendants, requiring the putative class to "recover those wages they believe to be due and owing through litigation—rather than the AB 1513 safe harbor—was profoundly not in the class members' best interest." (*Id.* at 25–26.) Allegedly, this "jeopardized the ability of employees to recover at all," "significantly delayed" recovery, and allowed any ultimate recovery to be reduced by class counsel's attorneys' fees. (*Id.*) Defendants allege that these circumstances establish that attorney Martinez and the UFW "put their own monetary interests ahead of the same class

members they now seek to represent." (*Id.* at 26.)

The undersigned finds defendants' arguments in this regard to be unpersuasive. Plaintiffs note they agreed to a protective order barring them from sharing confidential information with the UFW. (Doc. No. 150 at 15.) Defendants have presented no evidence in connection with the pending motion that shows the interests of the UFW, attorney Martinez, and the class members are at odds. This court has already rejected the same argument made by defense counsel here against attorney Martinez in another case. *See Amaro v. Gerawan Farming, Inc.*, No. 1:14-cv-00147-DAD-SAB, 2016 WL 3924400, at *17 (E.D. Cal. May 20, 2016). Additionally, the court remains unconvinced that, even if there was evidence that attorney Martinez was involved in the defendants' exclusion from AB 1513's safe harbor provisions, it would be evidence of an interest on his part that conflicts with the class. The safe harbor provision at issue allowed offending companies to pay only for the actual rest period time owed and to avoid paying a premium penalty. *See* Labor Code § 226.2(b) (providing an affirmative defense in certain situations to statutory penalties and damage claims where employers paid the amount due by December 15, 2016). Plaintiffs do not concede that attorney Martinez was involved in having defendants excluded from the safe harbor provision. However, they do point out that the safe harbor would have allowed defendants to escape paying significant amounts in damages, thereby reducing class recovery in this case by millions of dollars. (Doc. No. 150 at 15, n.7.) Actions by counsel that might well serve to increase a recovery by the class would not appear to pose any obvious conflict with class counsel's general duties to the class. In any event, the court concludes that no conflict of interest on the part of attorney Martinez has been established by defendants.[10]

Absent any demonstrated conflicts of interest, and given the qualifications of class counsel, the court is satisfied they will vigorously and adequately pursue representation of the class. *Ellis*, 657 F.3d at 985. The court will therefore deem Martinez Aguilasocho & Lynch

---

[10] Defendants also believe there is a conflict of interest because the UFW unsuccessfully attempted to unionize defendants' employees after the filing of the class action. (Doc. No. 147 at 26.) Defendants contend in summary fashion that attorney Martinez's dual role as general counsel for the UFW and class counsel in this case "creates an obvious and unresolvable conflict of interest." (*Id.*) Absent any explanation for this contention, no conflict is apparent to the court.

APLC and Bush Gottlieb to be appropriate class counsel.

### C. Numerosity and Typicality

Defendants do not dispute that numerosity and typicality are met for each of the subclasses. Plaintiffs indicate that even the smallest potential subclass—the Ghost Worker Subclass—contains hundreds of employees. (Doc. No. 145 at 31, n.39.) Most of the other subclasses are made up of at least 14,000 employees, and potentially more. (*Id.*) This is well beyond the size needed to satisfy numerosity requirements. *See, e.g.*, *Orvis*, 281 F.R.D. at 473 (numerosity met with 260 class members); *Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.").

Further, plaintiffs' claims mirror those of each of the subclasses that they intend to represent. Plaintiffs have provided declarations indicating they would fit within the subclass definitions below and are bringing the same substantive legal claims. (*See* Doc. No. 145-6 at 91–113.) Plaintiffs Aldapa and Avalos's claims are "reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The court finds plaintiffs' claims to be typical here. Therefore, the numerosity and typicality requirements of Rule 23(a) will be deemed to have been satisfied for each of the subclasses discussed below.

### D. Certification of the Subclasses

The court will now examine the propriety of certifying each subclass, and will address both the remaining Rule 23(a) and 23(b)(3) factors for each.

#### 1. Piece Rate Rest Period Subclass

Plaintiffs seek to establish a subclass for violations of Labor Code § 226.7 and Wage Order No. 14-2001. (Doc. No. 145 at 43–47.) As with a number of the subclasses below, defendants contest commonality, predominance, and superiority in various respects.

##### a. *Commonality*

As mentioned above, an appropriately certified class requires "a common contention . . . of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

22

1    one stroke." *Dukes*, 564 U.S. at 350.

2         Labor Code § 226.7 and IWC Wage Order No. 14-2001 (codified at 8 Cal. Code Regs.

3    § 11140) work together to control the provision of rest breaks by employers to non-exempt

4    agricultural employees, whether paid on a piece rate or hourly basis.  Labor Code § 226.7 serves

5    as an enabling statute, mandating that employers provide breaks in a manner consistent with the

6    wage orders, as well as other authorities.  The wage order states the specific requirements to

7    which an employer of agricultural workers must adhere:

8              Every employer shall authorize and permit all employees to take
              rest periods, which insofar as practicable shall be in the middle of
9              each work period.  The authorized rest period time shall be based
              on the total hours worked daily at the rate of ten (10) minutes net
10             rest time per four (4) hours or major fraction thereof.  However, a
              rest period need not be authorized for employees whose total daily
11             work time is less than three and one-half (3 1/2) hours.  Authorized
              rest period time shall be counted as hours worked for which there
12             shall be no deduction from wages.

13   8 Cal. Code Regs. § 11140(12).  California courts have held that this provision means that one

14   10-minute rest period is required for shifts between three and one-half and six hours in length,

15   two 10-minute rest periods are required for shifts between six and ten hours, and three 10-minute

16   rest periods for shifts between ten and fourteen hours.  *See Alberts v. Aurora Behavioral Health*

17   *Care*, 241 Cal. App. 4th 388, 400 (2015) (citing *Brinker Rest. Corp. v. San Diego Cty. Superior*

18   *Court*, 53 Cal. 4th 1004 (2012)).  Labor Code § 226.7 reiterates that rest breaks are to be counted

19   as hours worked, and that rest breaks cannot result in a deduction of wages.

20        California law also requires piece-rate employees to be separately compensated for rest-

21   break periods at an amount not less than the minimum wage.  Lab. Code § 226.2; *Gonzalez v.*

22   *Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 44–45 (2013); *Bluford v. Safeway Stores, Inc.*,

23   216 Cal. App. 4th 864, 872 (2013).  "[C]ompliance [with this requirement] cannot be determined

24   by averaging hourly compensation."  *Bluford*, 216 Cal. App. 4th at 872.  Rather, "employees

25   [must] be compensated at the minimum wage for each hour worked."  *Gonzalez*, 215 Cal. App.

26   /////

27   /////

28   /////

23

4th at 45 (citing *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (2005)).[11]  While the law

compels employers to "authorize and permit" rest breaks, it does not mandate that employees take

these breaks.  8 Cal. Code Regs. § 11140(12); Cal. Dep't of Indus. Rel., Division of Lab.

Standards Enforcement, Opinion Letter (Jan. 28, 2002).  In addition, employers are not required

to track rest periods.  8 Cal. Code Regs. § 11140(7)(A)(3); *see also Munoz v. Giumarra Vineyard

Corp.*, No. 1:09-CV-0703 AWI JLT, 2015 WL 5350563, at *6 (E.D. Cal. Sept. 11, 2015); *In re

Taco Bell Wage &Hour Actions*, No. 1:07-cv-1314 LJO DLB, 2012 WL 5932833, at *11 (E.D.

Cal. Nov. 27, 2012) ("While meal beaks are required to be recorded on time cards and therefore

provide a reliable record, California law does not require employers to record rest periods.").

Plaintiffs argue that here the Piece Rate Rest Period Subclass should be certified because

defendants maintained a universal rest period policy, and piece rate workers took rest breaks

during their shifts.  (Doc. No. 145 at 45.)  Similarly, plaintiffs contend that defendants utilized a

universal compensation system, which compensated all field workers on either an hourly or a

piece-rate basis.  (*Id.*)  Because of this, plaintiffs assert, the payroll records reflect whether

defendants provided separate hourly compensation for the rest periods of their piece rate

employees.  (*Id.* at 46.)  Plaintiffs maintain that from March 17, 2011 (the beginning of the

proposed class period) until at least October 2013, defendants provided no separate compensation

for rest periods, and that, between November 2013 and February/March 2014, defendants

provided separate compensation for rest periods for less than the minimum amount of time

required by law.  (*Id.*)  Finally, plaintiffs claim that following March 2014, while some rest

breaks were provided to piece rate employees, not all of defendants' workers received them.  (*Id.*

at 46–47.)

Plaintiffs have presented evidence of the following.  It was defendants' company policy to

provide rest periods for all field workers, regardless of whether they work on an hourly or piece-

---

[11]  Hours paid as a result of Labor Code § 226.7 are treated as wages under California law.
*Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1114 (2007).  Further, the employee is
entitled to payment "immediately upon being forced to miss a rest or meal period." *Id.* at 1108.
Thus failure to compensate appropriately for rest breaks would also violate 29 U.S.C. § 1832(a)
(requiring payment of "wages owed to [seasonal agricultural] worker[s] when due").

rate basis, consisting of one 10-minute break for three hours or more of work, and a second break for seven[12] or more hours of work. (Doc. No. 145-1 at 130) (Deposition of Christopher Rodriguez, defendants' Person Most Knowledgeable ("PMK")). This policy was eventually reduced to writing. (Doc. No. 145-1 at 500 (Notice of Rest and Meal Period Policy).) Similarly, defendants have universal pay policies for certain types of employees: all pruning work is compensated hourly at the minimum wage, while harvesting of mandarins and grapes was paid on a piece rate basis (though the piece rate could either be a group piece rate or an individual piece rate). (Doc. No. 145-1 at 108–12 (PMK Deposition).)

It is also clear that whether an employee was separately compensated for rest periods can be readily determined by reviewing payroll records for that employee. (*See id.* at 185–91.) Plaintiffs' retained statistical expert, Jeffrey Petersen, declares that he received and analyzed payroll data[13] from defendants. (Doc. No. 145-3) (Declaration of Jeffrey Petersen). According to Dr. Petersen, there were a total of 9,427 subclass members who worked 620,348 individual work days during the class period. (*Id.* at ¶ 10.) He concluded a rest break was not paid on a piece rate employee workday if either (a) a shift was between 3.5 and 6.0 hours, and there was no record of a payment for at least 0.1667 hours in the "regular pay" column[14]; or (b) there was a recorded

---

[12]  As stated above, California law requires a second rest break at six hours of work, not seven. *See Alberts*, 241 Cal. App. 4th at 400. Defendants' Person Most Knowledgeable ("PMK") testified in the same deposition that documents which suggested a second rest period was available at seven hours of work reflected a "misprint," and that they should reflect a second rest period at six, not seven, hours of work. (Doc. No. 145-1 at 138.) While there is a factual dispute about what defendants' rest policy actually was, plaintiffs maintain this is immaterial because defendants failed to provide legally sufficient rest breaks regardless. (Doc. No. 145 at 45 n.58.)

[13]  It is unclear whether Dr. Petersen has analyzed all of defendants' payroll data. Plaintiffs' brief notes that defendants may only have disclosed payroll records for 25 percent of the total class, pursuant to an earlier discovery dispute. (Doc. No. 145 at 22.)

[14]  Dr. Petersen states that, when defendants made rest period payments for piece rate employees, they were categorized as non-productive time and paid as "regular pay," thus appearing distinctly in the payroll record. (Doc. No. 145-3 at ¶ 11, n.5.) The figure found significant for rest period purposes corresponds to a ten minute period of work time, as ten minutes is 0.1667 hours. (*Id.*) Each was purportedly paid at the minimum wage. Some entries reflected a 0.16 hour payment, which Dr. Petersen counted as no rest period payment being received, because 0.16 hours equates to only 9.6 minutes. (*Id.*) Because each of these rest periods was paid at the minimum wage, a payment for 9.6 minutes reflects a payment below the state minimum wage. (*Id.*)

shift of more than 6.0 hours, but no payment for at least 0.3333 recorded.  (*Id.* at ¶ 11.)

This subclass is premised on the central claim that defendants failed to make legally sufficient payments to their workers for all rest periods.  Defendants' rest period policy changed throughout the proposed class period.  It is undisputed rest periods for piece rate employees were not separately compensated at an hourly rate—allegedly in violation of California labor law—between March 2011 and November 2013.  (*See* Doc. No. 145 at 46; Doc. No. 147 at 40.)  From November 2013 to March 2014, plaintiffs contend that while rest breaks were separately compensated, the compensation was legally insufficient, because they were compensated at the minimum wage for only 9.6 minutes, rather than 10 minutes.  (*See* Doc. No. 145-1 at 187–88 (PMK Depo.)) (noting that, in March 2014, defendants began separately compensating for 0.17 hours of rest break time per rest break, rather than 0.16 hours).  Finally, while the policy following March 2014 was facially valid, defendants in fact failed to compensate all subclass members separately for each rest period.   (Doc. No. 145-1 at 188–91 (PMK Depo.).)  Despite the fact that defendants' rest period policy changed throughout the period in question, it is apparent that whether a rest period was separately compensated and the amount of compensation provided for rest breaks are determinable simply from reviewing defendants' payroll records.  (*See, e.g.*, *id.* at 185–91.)  The common issue of whether defendants maintained a lawful rest period policy and appropriately made rest period payments under California law is common to this subclass. Commonality is therefore satisfied here.

b. *Predominance*

Common issues also predominate over individual ones within this subclass.  As explained above, defendants maintained universal payroll policies concerning compensation for rest periods applicable to all piece rate employees.  Furthermore, plaintiffs' claims will succeed or fail based on the ultimate determination of whether defendants' policies were lawful under California law and whether class members were actually paid in accordance with those policies.  Both issues are capable of determination on a subclass-wide basis:  whether defendants' policies were lawful affects all similarly situated employees, while whether class members were paid in accordance with those policies can be determined by looking to a single body of evidence—defendants'

26

payroll records.

Defendants argue that they anticipate raising as a defense that their piece rate workers regularly skipped rest breaks, and that this defense will result in individual issues predominating over common ones. (Doc. No. 147 at 41–46.) In support of this position, defendants do offer at least some evidence that their workers occasionally skipped rest breaks. (*See, e.g.*, Doc. No. 147-8 at 15 (Amador) ("Sometimes I prefer to work through my break in order to catch up if I am running behind of the crew. I estimate this happens very few times and when it does, I only do it for about five (5) minutes of my break."); Doc. No. 147-8 at 108 (Diaz) ("Although extremely rare, Saturday's [sic] the crew would work through our morning break and instead would combine it with our lunch in order to take a forty (40) minute lunch."); Doc. No. 147-10 at 95–96 (Mendoza) ("From the time I started with the company until about 2014, our crew would agree and get permission from our foreman to skip over our rest break and lunch break on Saturdays when we worked shorter days, in order to get out earlier.").) Nonetheless, defendants' argument in this regard does not defeat predominance.

For the period from March 2011 to November 2013, any individualized defenses on the grounds identified by defendants would appear to be irrelevant to consideration of this aspect of plaintiffs' motion for class certification. Plaintiffs' claim is based on Labor Code § 226.7 which states that "[i]f an employer fails to provide . . . [a] rest or recovery period in accordance with a state law, . . . the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that . . . [the] rest or recovery period is not provided." As set forth above in addressing the issue of commonality with respect to this subclass, plaintiffs' claim here is that state law required the class members to be separately compensated for rest breaks during this period. Thus, this claim is focused on the manner in which the rest breaks were compensated by defendants, not whether the rest breaks were in fact taken by their workers.[15] It appears to be undisputed that none of the rest breaks for defendants'

---

[15] Specifically, plaintiffs' contend that defendants' piece rate employees were not being separately compensated on an hourly basis for rest breaks as required by state law. Whether plaintiffs' claim in this regard is supported by state law is a question going to the merits of their claim rather than to whether class certification as to it is appropriate.

piece rate employees during the specified period of time were compensated separately on an hourly basis. Therefore, if plaintiffs are correct in contending that defendants' policy in this regard was in violation of the requirements of California law, it would also be undisputed that defendants failed to provide *any* "rest or recovery period[s] in accordance with a state law" from March 2011 to November 2013, because class members were unable to take a separately compensated rest period even if they sought to do so. *Brinker*, 53 Cal. 4th at 1033 ("No issue of waiver ever arises for a rest break that was required by law but never authorized; if a [legally-compliant] break is not authorized, an employee has no opportunity to decline to take it."); Labor Code § 226.7. Therefore, the court concludes that the common issues here "are more prevalent or important than" the individual issues. *See Tyson Foods, Inc.*, 136 S. Ct. at 1045 (quoting Newberg on Class Actions § 4:50, pp. 196–97).

Defendants also indicate that, for the period from November 2013 to March 2014, they will raise both a *de minimis* defense as well as a merits defense, because the alleged violation is that rest periods were undercompensated, not uncompensated. (*See* Doc. No. 147 at 46) ("[E]ven if the court agrees with Plaintiffs' argument that compensation for such rest periods in the amount of 0.16 of an hour, or 9.6 minutes, constitutes an unpaid rest period as opposed to *de minimis* violation . . ."). Defendants cite no authority establishing that a *de minimis* defense is cognizable under state law, although the Ninth Circuit has held such a defense exists to unpaid overtime claims under the Fair Labor Standards Act ("FLSA"). *See Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir. 1984) (noting courts should look to factors such as practical administrative difficulty of reflecting the time, the aggregate size of the claim, and the regularity of the excess work in the context of that case).[16] Moreover, district courts have held that this defense does not preclude class certification in other circumstances. *See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 618 (C.D. Cal. 2015). In any event, the court concludes that here both *de minimis* and merits-based defenses tend to support, rather than

---

[16] A question of a similar nature—whether California recognizes a *de minimis* defense to claims for unpaid wages under Labor Code §§ 510, 1194, and 1197—has been certified to the California Supreme Court. *See Troester v. Starbucks Corp.*, 680 Fed. App'x 511, 2016 WL 8347245 (9th Cir. June 2, 2016). It appears that the question remains pending before that court.

undermine, class certification, as they too will be issues suitable for resolution across the entire subclass. Defendants have not explained how the assertion of these defenses must be applied individually.

Finally, from March 2014 onward, plaintiffs concede that defendants' policies were lawful. Rather, plaintiffs maintain that class members were not always paid in accordance with those policies. Defendants argue that their payroll records will not provide a common method of proof with respect to this claim because they will only show whether an individual was compensated for a rest period, but cannot show whether an employee freely chose to waive any given rest period.

Regardless of whether a waiver defense to these claims is cognizable,[17] defendants have failed to establish that assertion of such a defense would cause individual issues to overwhelm class questions. Defendants bear the burden of pleading and proving any affirmative defenses they seek to raise. *See Brinker*, 53 Cal. 4th at 1053 (noting that waiver "is an affirmative defense, and thus the burden is on the employer, as the party asserting waiver, to plead and prove it"); *see also Sliger v. Prospect Mortg., LLC*, 89 F. Supp. 2d 1212, 1217 (E.D. Cal. 2011). Of the 100 employee declarations provided by defendants, only in seven do employees recall ever skipping a rest break; of those seven, the declarations state that this practice was very infrequent. (Doc. No. 147-8 at 15 (Amador) (estimating she skipped a rest break "very few times"); *id.* at 108 (Diaz) (describing skipping a rest break as "extremely rare"); Doc. No. 147-10 at 95–96 (Mendoza) (describing skipping rest breaks on Saturdays only); Doc. No. 147-11 at 58 (Perez) (describing skipping rest breaks "occasionally" on Saturdays, and noting this stopped occurring when the individual piece rate system was put in place); *id.* at 78–79 (Ramos) (stating that skipping rest

---

[17]  It is unclear whether employees may waive rest periods under California law. *Compare* Cal. Dep't of Indus. Rel., Division of Lab. Standards Enforcement ("DLSE"), Opinion Letter (Jan. 28, 2002) (noting that no rest break is required for any employee who "freely chooses without any coercion or encouragement to forego or waive a rest period") *with Bufil v. Dollar Fin. Grp., Inc.*, 162 Cal. App. 4th 1193, 1205 (2008) (citing 8 Cal. Code Regs. § 11040(11)(A), (12)(A)) ("[T]he purported meal period waivers had nothing to do with the rest period claims because an employee cannot waive such claims. The permitted waiver of the meal requirement applies only to meal periods, not to rest breaks.").

breaks had "occurred less than about ten (10) times"); Doc. No. 147-12 at 48 (Toledo) (noting that, some years ago, his crew would skip rest breaks on Saturdays if everyone, including the foreman, agreed); *id.* at 85 (Vargas) (noting that sometimes his crews would skip rest breaks on Saturdays but it "didn't happen all the time back then and it does not happen at all anymore"). None of the employees suggested they skipped all, most, or even a sizable number of their rest breaks.  Defendants have presented no evidence suggesting any waiver defense permeates this subclass to the point a liability determination would require individualized attention.  Moreover, the Ninth Circuit has approved of the use of statistical sampling and representative testimony as a method to determine liability in wage-and-hour class actions.  *See Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("Since *Dukes* and *Comcast* were issued, circuit courts including this one have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability.").  To the extent defendants wish to prove that individual class members waived rest breaks, they may do so at the damages phase of the case.  *See id.* at 1168 (noting with approval the district court's decision to preserve defendant's "opportunity to raise any individualized defense it might have at the damages phase of the proceedings"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3).").

In short, defendants' liability under this subclass can be determined based on legal disputes common to all subclass members, including whether defendants' varying rest period policies were lawful and whether they are subject to a *de minimis* defense.  These issues will predominately be resolved based on one body of evidence—defendants' payroll records—also supporting subclass-wide resolution.  Finally, defendants have presented very little evidence supporting an affirmative waiver defense.  To the extent they have shown that any waiver occurred, it appears to the court that such evidence is more properly categorized as relevant only to the damages inquiry, rather than one pertaining to plaintiffs' central theory of liability.  Therefore, the court concludes that subclass-wide issues predominate with respect to this subclass.

/////

c. *Superiority*

For many of the same reasons that this court concludes subclass-wide issues predominate, it likewise concludes that class treatment of the piece rate rest period subclass claims is superior to individual treatment. In determining superiority, the court is to look to issues such as class members' interests in individual control of the litigation, the extent of any litigation already begun by class members, the desirability of concentrating the litigation in a particular forum, and the likely difficulties in managing a class action. *See* Fed. R. Civ. P. 23(b)(3)(A)–(D). There has been no showing here that any of the class members have a separate interest in individual control of the litigation, or that suits by class members are already pending on these same issues. Moreover, the types of claims at issue here likely involve smaller amounts of damages, for which the only practical means of seeking redress is class treatment. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action.").

Finally, while defendants do raise some issues that they believe will result in difficulties managing the class action at a later stage in this litigation, this does not defeat class certification. The Ninth Circuit has emphasized that administrative feasibility is not a stand-alone prerequisite to class certification, and that there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). Indeed, here, the only real manageability concern defendants have presented is their potential waiver defense and, as noted above, there is scant evidence suggesting that this will be a genuine issue running throughout the subclass.

For all of these reasons, the court concludes a class action is superior to individual resolution of these claims against defendants, and therefore will certify the Piece Rate Rest Period Subclass as follows:

/////

/////

/////

/////

<u>Piece Rate Rest Period Subclass</u>

All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and were compensated on a piece rate basis.[18]

2. <u>Unpaid Travel Time Subclass</u>

Plaintiffs seek certification of a subclass to litigate the issue of whether defendants were required to compensate them for unpaid travel time between various work sites.

a. *Commonality*

Plaintiffs assert, and defendants do not dispute, that class members were required to be compensated for any time spent traveling between different fields during their shifts. (Doc. No. 145 at 47; Doc. No. 147 at 50.) Indeed, any compulsory travel time is generally compensable as "hours worked" for agricultural employees in California. *See Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 595 (2000).[19]

Supporting commonality are twenty-five declarations from putative class members generally recalling that they were required to travel between thirty minutes and one hour between fields during mandarin harvest season numerous times per week. (*See* Doc. No. 145-4 at 5 (Magdaleno); *id.* at 12 (Hinojosa); *id.* at 17–18 (Torres); *id.* at 26 (Estrella); *id.* at 40–41 (Vega); *id.* at 47 (Gonzalez); *id.* at 55–56 (Vargas); *id.* at 65 (de Estrella); *id.* at 72 (Rojas); *id.* at 80 (Hinojosa); *id.* at 86 (Carranza); *id.* at 96 (Orozco); Doc. No. 145-5 at 6 (Reyna); *id.* at 31

---

[18] This subclass definition differs somewhat from that originally proposed by plaintiffs. The court has reformulated this and other subclasses below to address concerns attached to so-called "fail-safe" classes. *See, e.g.*, *Ruiz v. Citibank, N.A.*, Nos. 10 Civ. 5950 (KPF)(RLE), 10 Civ. 7304 (KPF)(RLE), 2015 WL 4629444, at *7 (S.D.N.Y. Aug. 4, 2015) ("Such 'fail-safe classes' present myriad problems, including the risk that plaintiffs might effectively litigate their claims without the risk of an adverse judgment: either they 'win' and are in the class, which by definition cannot lose its claim, or they 'lose' and are outside the class, and thus are not bound by an adverse decision."); *see also Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1138 n.7 (9th Cir. 2016) (noting the Ninth Circuit requires only a "reasonably close fit between the class definition and the chosen theory of liability" so as to avoid the problems of fail-safe classes); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005) ("A court may divide a class into subclasses on motion of either party, or *sua sponte*.") (citing *Burka v. N.Y.C. Transit Auth.*, 110 F.R.D. 595, 603–04 (S.D.N.Y. 1986)).

[19] Again, since this time is compensable as hours worked, it counts as wages that must be paid under 29 U.S.C. § 1832(a).

(Patron); *id.* at 39 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.* at 70 (Gutierrez); *id.* at 77–78 (Esquivel); *id.* at 86–87 (Reyes); Doc. No. 145-6 at 4 (Sanchez); *id.* at 74–75 (Cabrales); *id.* at 81 (Hernandez); *id.* at 85 (Monzon).)  All of these declarations state that the employees were not compensated for this travel time.  Defendants' PMK testified at his deposition that, in the early part of the class period, workers would travel between fields in their own vehicles during mandarin season, alternately doing pruning and harvesting work.  (Doc. No. 145-1 at 119–20.)  Further, the PMK testified that defendants' payroll records did not reflect any separate travel time compensation for those employees.  (*Id.* at 163, 171–72, 174–77, 180, 184.)  It is clear there are common questions of fact and law that run throughout the proposed subclass, and that there is a common method of proof—defendants' payroll records—which will further facilitate subclass-wide resolution.  Commonality is therefore satisfied with respect to this subclass.

### b. *Predominance*

Defendants do not contest predominance as such here.  Rather, defendants complain the class is not ascertainable.  (Doc. No. 137 at 48–51.)  As noted above, there is not a stand-alone prerequisite of administrative feasibility which the plaintiffs must meet in order to certify a class; rather, administrative concerns are simply a part of the analysis of whether a class action is a superior method of resolving a dispute.  *See Briseno*, 844 F.3d at 1128.  Defendants' arguments in this regard will therefore be addressed in connection with the consideration of superiority, below.

Meanwhile, the central issue concerning this subclass is whether defendants were required to compensate their employees for travel time between job sites, and whether they did so.  This subclass is readily subject to not only common legal issues, but common proof.  Defendants' PMK acknowledged at his deposition that defendants' payroll records reflect unique codes identifying what specific fields various workers were working in on a particular day, along with identifying information about that grower, allowing a determination as to when workers travelled to two different fields in one day.  (Doc. No. 145-1 at 150–55.)  Plaintiffs also supplied a ranch map index and list of growers which they purport allow for the determination of the driving time between any two fields reflected in the payroll records.  (*See* Doc. No. 145 at 48; Doc. No. 184.)

Plaintiffs' expert Dr. Petersen explains how he will calculate the unpaid travel time in his declaration. First, he notes that, within the data he received, 14.3 percent of the workdays during the class period reflect work performed at more than one location. (Doc. No. 145-3 at ¶ 18.) To calculate the payments due, he would "randomly draw a number of days when class members traveled that is representative of the entire class." (*Id.* at ¶ 19.) Dr. Petersen states he understands the coded job sites depicted in the payroll records are attached to addresses, which he would then input into Google Maps to determine the length of time it would take to drive between job sites. (*Id.*) He notes that, if there are not addresses readily available, plaintiffs would need to seek further data production from defendants to confirm the location of the job sites in question. (*Id.*) According to Dr. Petersen, the data from each of the sample drive times selected will be aggregated to determine the average travel time per work days, within an acceptable margin of error. (*Id.*) This average number will then be combined with the number of days where travel time payments were due and the associated hourly wage rate to determine the damages for the class for unpaid travel time. (*Id.*)

Defendants concede that the claims raised by this subclass are susceptible of common proof. Defendants argue that either no travel time was incurred or all payments were appropriately made, because their payroll records reflect some travel periods were separately compensated and recorded. (*See* Doc. No. 147-5 at ¶ 15) (giving an example of 0.41 hours of travel time paid separately to plaintiff Avalos on November 27, 2013).) The evidence referred to by defendants may be relied upon to support a merits-phase argument and is not appropriately addressed at this stage of the proceeding. However, the court notes that defendants' PMK declares he was able to determine that there was separate compensation provided for travel time by examining payroll records, the grower list, and the ranch map index. (*Id.*) This statement makes clear that defendants can discern from the payroll records whether an employee was appropriately compensated for travel time. This, in turn, demonstrates the viability of this claim being addressed on a subclass-wide basis: both parties can determine solely from defendants'

/////

/////

records whether the employees were separately compensated for travel time.[20]

Because this claim is susceptible of common proof and will involve common legal questions that clearly outweigh any individual issues, predominance is satisfied.

### c. *Superiority*

The court also concludes that class treatment of this claim is superior to individual treatment. No showing has been made that any other individual litigation of the putative subclass members has begun, or that any individual subclass members are interested in seeking separate recourse. The cumbersome nature of attempting to pursue many small-value claims individually further supports concentrating all of them within one forum.

Defendants challenge the ascertainability of this subclass, which the court again takes to be a challenge to the administrative feasibility or manageability of the subclass. *See Briseno*, 844 F.3d at 1124, n.3 (refraining from using the term "ascertainability" because of the varied meanings given to it by courts). Defendants assert numerous individual determinations that would have to be made in order to identify the members of the class. (Doc. No. 147 at 50–51.) However, the class definition need not be so exact as to only cover individuals who in fact suffered the injury alleged. *See Torres*, 835 F.3d at 1138, n.7 (noting the Ninth Circuit requires only a "reasonably close fit between the class definition and the chosen theory of liability," because requiring a class definition that is too precise leads to problems associated with fail-safe classes). All that is required for class definition is that it set forth "common characteristics sufficient to allow a member of that group to identify himself or herself as having a [potential] right to recover based on the description." *Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH(AJB),

---

[20] Defendants also argue that, if the two fields at which a given class member worked are contiguous, there would be no compensable travel time between them and therefore no violation of the law. This argument is not well taken. Even to the extent this could theoretically be true, defendants make no showing that any of their fields are in such close proximity to one another that there would be no travel time between them, let alone that any putative class members actually worked at two such contiguous fields on the same day during any part of the class period. Indeed, the evidence before the court suggests that the fields in question range over a wide area. (*See* Doc. No. 145-1 at 85–87) (noting that, according to the PMK, the fields on which the putative class members work range as far north as Madera and as far south as Goshen (approximately 65 miles apart) and as far east as Sanger and as far west as Kerman (approximately 35 miles apart)).

2011 WL 8984448, at *1 (S.D. Cal. July 13, 2011).

As such, having found all the criteria met for certification, the court certifies the following subclass, which will allow potential class members to know whether they are a member of that group and have a potential right to recover:

> Unpaid Travel Time Subclass
>
> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and worked at two or more fields in one day.

### 3. Vehicle Expense Subclass

Plaintiffs seek to certify a subclass for unreimbursed vehicle expenses incurred by class members when they drove their cars between various worksites. Defendants essentially renew their objections to certification under the unpaid travel time subclass in opposition to certification of this subclass. (Doc. No. 147 at 54–55.)

#### a. *Commonality*

Under California law, an employer "shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). This is generally understood to include vehicle expenses. *See Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 567–68 (2007) (noting the parties agreed § 2802 required "an employer to indemnify its employees for expenses they necessarily incur in the discharge of their duties," and finding employer could do so by enhancing the base salary under certain circumstances). Defendants' PMK testified at his deposition that defendants' employees are not compensated for mileage reimbursements for driving their own cars between worksites. (Doc. No. 145-1 at 249.) It is clear that this subclass contains common legal issues and company policies.

#### b. *Predominance*

Plaintiffs submit that, for many of the same reasons that the Unpaid Travel Time Subclass is appropriate for certification, so is this subclass. In addition to the facts stated above showing that travel between different worksites can be determined by defendants' own records, defendants' PMK testified that employees are never provided mileage reimbursements or

36

automobile allowances for their vehicle expenses when traveling between fields because "they're paid for that time." (Doc. No. 145-1 at 249.) Plaintiffs have come forward with declarations from individual class members reflecting that they drove their own car between fields and were not reimbursed for it. (Doc. No. 145-4 at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.* at 65 (de Estrella); *id.* at 80 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 32 (Patron); *id.* at 39 (Carrera); *id.* at 64 (Alvarez); *id.* at 70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); *id.* at 96 (Machuca); Doc. No. 145-6 at 4–5 (Sanchez); *id.* at 56 (Gonzalez); *id.* at 75 (Cabrales); *id.* at 81 (Hernandez); *id.* at 85–86 (Monzon).)

Defendants believe predominance is not met here because the identity of the individuals who drove vehicles between worksites cannot be determined solely from defendants' payroll records, which is undisputed. Indeed, there is evidence that some employees carpooled to work and presumably between job sites while at work. (*See* Doc. No. 147-5 at 4 (PMK Depo.) ("[O]ver the class period, while performing my duties as Director of Human Resources for Ag Force and FPC, I have observed that it is more common than not for agricultural employees to carpool to work."); Doc. No. 147-8 at 37 (Ayala) ("I arrive this early because the ladies I carpool with pick me up early."); *id.* at 92 (Cruz) (carpool driver); *id.* at 96 (Cruz) (carpool driver); *id.* at 101 (de Jesus) (sometimes carpools); Doc. No. 147-9 at 13 (Dung); *id.* at 6 (Garcia); Doc. No. 147-12 at 9 (Sanchez); *id.* at 68 (Valencia).) However, the number of individual employees whom actually drove vehicles between fields goes to the question of damages with respect to this subclass, not to liability with respect to the claim. The liability question will be resolved by looking to whether defendants were required to compensate employees for mileage for driving their own vehicles between job sites, and whether they did so. Once again the court notes, individualized damages inquiries do not defeat class certification. *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094.

Here, the parties do not contest that the question of liability with respect to this claim is readily determinable across the subclass. Accordingly, the court finds that common issues predominate over individual ones.

/////

c.     *Superiority*

Defendants' main objection to this subclass is, as with the Unpaid Travel Time Subclass, based upon defendants' contention that it is not manageable. (Doc. No. 147 at 54–55.) At its core, this is a challenge to the superiority of pursuing this cause of action on a subclass-wide basis. According to defendants, because it is not apparent from their records whether an employee drove a car from one worksite to another, thereby incurring reimbursable expenses, this will necessitate a series of individual inquiries as to damages. (*Id.*) However, plaintiffs' expert Dr. Petersen suggests a damages determination for this subclass would be reached by combining his analysis of the damages attributable to the unpaid travel time subclass with an aggregated average travel distance, multiplied by the IRS mileage reimbursement rate. (Doc. No. 145-3 at ¶ 20.) In a footnote in his declaration, Dr. Petersen represents that he will determine how many individuals drove their own vehicles between worksites by employing surveying techniques, essentially asking class members whether they did so and how many co-workers typically rode with them. (*Id.* at ¶ 20, n.9.) This information would then "be used in the projection of class wide damages." (*Id.*) Alternately, plaintiff indicates that the number of individuals who drove their vehicles and are entitled to reimbursement can be identified through "self-certification," i.e. the submission of affidavits at the claims administration stage. (Doc. No. 150 at 25–26.) Other district courts in California have permitted just this type of procedure. *See Melgar v. CSk Auto, Inc.*, No. 13-cv-03769-EMC, 2015 WL 9303977, at *8 (N.D. Cal. Dec. 22, 2015); *Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 475–76 (S.D. Cal. 2015) (noting approval of classes "even when the only way to determine class membership is with self-identification through affidavits").

The court understands and appreciates defendants' concerns regarding the proposed statistical analysis. However, the court is likewise mindful that under binding Ninth Circuit precedent individualized damage assessments, standing alone, cannot serve to defeat class certification. *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094. Further, it is clear here that plaintiffs' anticipated damages models are not inconsistent with their alleged liability case. *See Comcast*, 569 U.S. at 34–35. Whatever method of determining damages may ultimately be employed here, the fact that plaintiffs have proposed statistical modeling at this stage does not

defeat class certification.  *See Jimenez v. Allstate Ins. Co.*, No. LA CV10-08486 JAK (FFMx), 2012 WL 1366052, at *15 (C.D. Cal. Apr. 18, 2012) (noting that although plaintiff had not met its burden of demonstrating that statistical sampling was proper for calculating damages, "this shortcoming is not sufficient to preclude class certification"); *In re Estate of Marcos Human Rights Litig.*, 910 F. Supp. 1460, 1464 (D. Haw. 1995) ("The use of aggregate procedures, with the help of an expert in the field of inferential statistics, for the purpose of determining class compensatory damages is proper.").  There are no issues with class manageability that render this subclass unsuitable for class treatment at this time.  Therefore, the following subclass is certified by the court:

> Vehicle Expense Subclass
>
> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, worked at two or more fields in one day, and drove their own cars between fields.

### 4.  Meal Period Subclass

Plaintiffs wish to certify a subclass of employees who were denied required meal periods or whose required meal periods were not recorded.  (Doc. No. 145 at 50–52.)  Defendants again argue that individual issues predominate as to this subclass, thereby making class certification inappropriate.  (Doc. No. 147 at 55–56.)

#### a.  *Commonality*

Defendants do not directly contest commonality with respect to this subclass.  California law requires employers to "authorize and permit all employees after a work period of not more than five (5) hours to take a meal period of not less than thirty (30) minutes."  8 Cal. Code Regs. § 11140(11).  If an employee is working no more than six hours during a day, they may validly waive a meal period by mutual consent of both employee and employer.  *Id.*  During the meal period, the employee shall not be required to work, unless the parties have executed a written agreement to an "on duty" meal period, which is required by the nature of the work.  *See* Cal. Labor Code § 226.7; 8 Cal. Code Regs. § 11140(11).  Generally, the employer's duty to provide a meal period to an employee is discharged "if it relieves its employees of all duty, relinquishes

control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal. 4th at 1004. Further, employers are required by law to record meal periods. *See* Cal. Code Regs. § 11140(7)(A)(3) ("Meal periods, split shift intervals and total daily hours worked shall also be recorded.").

Additionally, defendants apparently maintained a practice requiring forepersons to ensure each crew took a lunch break and took it at the same time, and that each lunch period was recorded. (Policies and Procedures for Crew Foreman – Lodged Doc.) Defendants' PMK testified at deposition that company policy requires the forepersons to record the start and stop time of the lunch break. (Doc. No. 145-1 at 137–38.) Nevertheless, there are numerous instances in defendants' records, confirmed by the PMK, where no lunch break was recorded for work periods of longer than five hours. (*See* Doc. No. 145-1 at 167–68; *id.* at 175–76; *id.* at 180; *id.* at 211–14.) The PMK testified he did not know why the company forepersons were not recording meal periods. (*Id.* at 214.)

Plaintiffs have submitted declarations from numerous class members in which those employees state that lunch breaks were frequently not given, and hence were not recorded. Those declarants have recounted that either they were told they would not get a lunch break because the crew had to change job sites during the day and the travel time was their lunch break, or simply because the foreperson failed to call for a lunch break. (Doc. No. 145-4 at 5 (Magdaleno) ("Only the foreman can tell the crew to take a lunch. If the foreman doesn't call lunch, we don't take it."); *id.* at 18 (Torres); *id.* at 26 (Estrella); *id.* at 48 (Gonzalez); *id.* at 57 (Vargas); *id.* at 65 (de Estrella); *id.* at 81 (Hinojosa); Doc. No. 145-5 at 7 (Reyna); *id.* at 12 (Hernandez); *id.* at 34 (Patron); *id.* at 39–40 (Carrera); *id.* at 50 (Melendres); *id.* at 58 (De Leon); *id.* at 64 (Alvarez); *id.* at 69–70 (Gutierrez); *id.* at 78 (Esquivel); *id.* at 87 (Reyes); Doc. No. 145-6 at 5 (Sanchez); *id.* at 66–67 (Garcia); *id.* at 75 (Cabrales); *id.* at 81 (Hernandez).)

Additionally, Dr. Petersen has declared that he received 24,271 pages of records consisting predominantly of daily time sheets compiled by crew forepersons from January 2011 to December 2015. (Doc. No. 145-3 at ¶ 13.) These time sheets, which are filled out by the crew

forepersons each day, have a specific section denoting start and stop times for a meal break. (*See, e.g.*, Doc. No. 145-1 at 362, 374, 379.) Dr. Petersen noted that, while examining these forms, if a half hour period was recorded, he assumed the crew had received a meal period, whereas if it was empty, he assumed no meal period was received. (Doc. No. 145-3 at ¶ 13.) Indeed, at deposition defendants' own PMK confirmed that crew forepersons record the meal period taken on these sheets. (Doc. No. 145-1 at 126–27.) The crew sheet records obtained by plaintiffs thus far depict approximately 12,135 crew work days (measured per crew, rather than per employee). (Doc. No. 145-3 at ¶ 14.) Dr. Petersen randomly selected 275 crew sheets to estimate a percentage of work days when class members did not receive the required meal break, which yielded 6,469 individual employee records for that sample. (*Id.* at ¶ 15.) He determined that there were 981 instances of individual employees not being provided meal breaks out of the sample, suggesting there was approximately a 15.2 percent rate of employees not being provided meal breaks. (*Id.*) Dr. Petersen clarified in a supplemental declaration that putative class members were not provided with a meal period on 15.2 percent of the days worked, not that 15.2 percent of the employees had suffered this injury at some point. (Doc. No. 178-1 at ¶ 3.)

As demonstrated by the above discussion, there are common legal questions that pervade defendants' liability to this subclass, and common proof—defendants' records and the parties' respective expert opinions concerning their interpretation—which will be used in determining liability. Commonality is therefore satisfied as to this subclass.

b. *Predominance*

Defendants present three separate arguments concerning why common issues do not predominate over individual issues with respect to this subclass. First, they argue that the 15.2 percent rate of missed meal payments calculated by Dr. Petersen is "exceptionally low under the assumption that Defendants made it a practice to deny workers a meal period." (Doc. No. 147 at 55.) Defendants represent that "a determination of liability and calculation of damages based on a rate this low will not achieve a reasonable method for allocating liability or damages across the class as the Compliance Rate varies from person to person, crew to crew, and crop to crop." (*Id.* at 55–56.) However, defendants do not explain why a low violation rate would affect the liability

41

determination here.  Nor do defendants provide any authority for the proposition that an employer must commit labor law violations at a particular rate to make those violations subject to class wide determination.  To the extent defendants' argument in this regard relates to how damages will ultimately be demonstrated and determined, the court notes defendants' concerns.  However, as explained above, such concerns are premature and cannot defeat class certification.  *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094; *Jimenez*, 2012 WL 1366052, at *15; *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 539 (N.D. Cal. 2012) ("[T]he need for individualized hearings does not, on its own, defeat class certification."); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 680 (N.D. Cal. 2011) ("[I]ndividual damages issues typically do not bar class certification where common questions predominate over individual questions as to liability.").

Defendants next argue that there are numerous potential reasons why their payroll records would have omitted a meal period, "including clerical errors, meal periods taken between assignments, errors in a crew boss's understanding of the law, or unforeseen circumstances which keep the crew working past five hours."  (Doc. No. 147 at 56.)  Defendants provide neither authority nor evidence to support either:  (1) that evidence exists supporting these possible explanations; or (2) that even if such evidence exists, it would support a legal defense from liability.  Without such support, defendants' argument that their suggested defenses are genuine and cognizable and therefore require individualized liability treatment is unpersuasive .  *Edwards*, 798 F.3d at 1184 ("When defendants opposing class certification raise a legal defense that may defeat commonality, the district court cannot assume its validity . . ."); *Anda v. Roosen Varchetti & Olivier, PLLC*, No. 1:14-CV-295, 2016 WL 7157414, at *4 n.1 (W.D. Mich. Oct. 31, 2016) ("[T]he mere possibility that Defendants could raise individualized defenses against Plaintiffs' claims is insufficient reason for this Court to depart from the well-settled rule that potential individualized defenses do not preclude class certification.").

Finally, defendants argue:

> The primary shortcoming of the use of sampling methodologies in class litigation is that a statistical (or any other) methodology does not exist that allows for the assignment of a proportional result to the non-sampled population.

(Doc. No. 147 at 56.) In this vein, defendants present the declaration of their expert, Dr. Joseph Krock, who opines that the sample on which plaintiffs' expert relied "identified 981 days out of 6,469 days on which workers purportedly did not receive a meal period. According to the proposed methodology, at least 269,188 days are going to be assigned as missed meal period days without actually determining whether a missed meal period exists." (Doc. No. 147-7 at ¶¶ 39–41.) As mentioned at oral argument on the pending motion, the court has struggled to understand this argument advanced by defendants. To the extent this argument suggests that statistical conclusions are inherently flawed or invalid, the court cannot adopt that proposition. *See, e.g.*, *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, No. CV 13-2747-DMG (AGRx), 2014 WL 5797541, at *3–4 (C.D. Cal. Oct. 7, 2014) (allowing introduction of statistical expert); *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1266 (N.D. Cal. 1997) (same). Defendants may be suggesting that a foreperson's failure to note whether a meal break was taken on crew sheets does not mean the crew actually missed a meal break. However, they have provided no evidence that this is the case, nor have they provided any authority suggesting it would be a defense to liability even if such evidence were to exist.

Again, the court understands defendants' concerns about the methodology to be employed in any ultimate calculation of damages with respect to this claim. Nevertheless, such concerns do not bar class certification here. *Leyva*, 716 F.3d at 513–14; *Yokoyama*, 594 F.3d at 1094; *Jimenez*, 2012 WL 1366052, at *15; *Ellis*, 285 F.R.D. at 539; *Herrera*, 274 F.R.D. at 680. Instead, it is largely undisputed that liability can be determined on a subclass-wide basis by determining whether defendants were required to and did compensate the class members for the meal periods, along with whether they recorded the meal periods, as required by California law. Therefore, predominance is satisfied as to this subclass

c. *Superiority*

Similar to the above subclasses, there is no indication that members of this subclass wish to pursue these claims individually or have filed suits to that end. To the extent defendants recast their qualms with this class under the guise of administrative feasibility or manageability, those arguments are rejected since they do not overcome the "well-settled presumption that courts

43

should not refuse to certify a class merely on the basis of manageability concerns." *Briseno*, 844 F.3d at 1128. For these reasons the following subclass is certified by the court:

> Meal Period Subclass

> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, for whom no meal period was recorded on at least one day in which the employee worked more than five hours.

### 5. Ghost Worker Crew Subclass

Plaintiffs seek certification for a subclass of individuals subjected to the practice of using so-called "ghost workers" or "muertitos." (Doc. No. 145 at 53–56.) Between the 2011 and 2014 mandarin harvest seasons, defendants compensated their employees who picked mandarins on a group piece rate basis: their compensation was based on a per-bin rate for all of the bins harvested by a given crew, divided in equal shares among the crew members. (*Id.* at 53.) Plaintiffs allege that various forepersons put fictitious employees—the ghost workers or muertitos—on their crew list, allowing the foreperson to claim the pay for these fictitious employees for themselves while also depriving each of the rest of the crew members of some portion of their wages. (*Id.* at 54.) As of the 2015 mandarin harvest season, defendants began paying their employees on an individual piece rate basis, eliminating the incentive and potential for this practice to continue.

At the court's request, plaintiffs provided supplemental briefing detailing their theories of the defendants' liability based on their forepersons' use of ghost workers. According to plaintiffs, there are six separate theories of liability with respect to this claim: (1) the basic nature of the employment relationship; (2) Labor Code § 221 and the AWPA; (3) California Business and Professions Code § 17200; (4) apparent authority liability for the torts of defendants' agents; (5) ratification of the tortious actions of its employees; and (6) negligent hiring of forepersons. (Doc.

/////

/////

/////

/////

44

No. 178 at 17–23.)  Several of these—namely, the last four—are summarily rejected by the court.[21]

Concerning their other two theories of liability, plaintiffs maintain defendants are liable pursuant to Labor Code §§ 221 and 1194, as well as the AWPA.  It remains unclear to the court in what way Labor Code § 221 could be applicable here.  California law prohibits "any employer" from "collect[ing] or receiv[ing] from an employee any part of wages theretofore paid by said employer to said employee."  Labor Code § 221.  Generally speaking, § 221 "was enacted in order to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages." *Finnegan v. Schrader*, 91 Cal. App. 4th 572, 584 (2001).  Plaintiff has not alleged that the defendant employers here collected or received any of the wages which should have gone to class members.

One California court has held that an underpayment of wages may, in certain circumstances, be considered a violation of § 221.  *Gonzalez*, 215 Cal. App. 4th at 50.  However, the California Court of Appeals' holding in *Gonzalez* was premised on a violation of Labor Code § 223, which prohibits "secretly pay[ing] a lower wage while purporting to pay the wage designated by statute or by contract."  *See Gonzalez*, 215 Cal. App. 4th at 50.  The employer in *Gonzalez* had utilized a payment system under which automotive service technicians were compensated at a flat, per-hour rate.  215 Cal. App. 4th at 41.  However, the hours were based on "flag hours," rather than actual hours worked.  *Id.*  The employer assigned each specific repair task a certain number of "flag hours," approximating the amount of time it believed a repair

---

[21]  To the extent plaintiffs now suggest their ghost worker claims against defendants rely on tort causes of action—whether established directly through negligent hiring, or through an agency theory such as apparent authority or ratification—their contention must be rejected. (Doc. No. 178 at 21–23.)  The operative pleading in this case set forth only causes of action based in statutory labor law. (*See* Doc. No. 129.)  No tort causes of action have been alleged in the operative complaint, and plaintiffs cannot hope to certify a subclass on the basis of claims they have not alleged. Further, Business and Professions Code § 17200 cannot provide an independent basis to warrant certification of this subclass, since this provision merely "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies provided thereunder." *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992).

45

should take. *Id.* A technician who completed a repair earned the amount of "flag hours" attributed to it, regardless of how long the repair actually took to complete. *Id.* No compensation was provided for down time, except that at the end of a pay period, the amount of compensation for "flag hours" was averaged across the total scheduled time for that pay period. *Id.* If the rate fell below the minimum wage, the employer would supplement the employees' pay accordingly. *Id.* In holding that this averaging was unlawful, the court in *Gonzalez* explained that such a scheme could be a violation of § 221, employing the following example:

> [A] technician who works four piece-rate hours in a day at a rate of $20 per hour and who leaves the job site when that work is finished has earned $80 for four hours of work. A second technician who works the same piece-rate hours at the same rate but who remains at the job site for an additional four hours waiting for customers also earns $80 for the day; however, averaging his piece-rate wages over the eight-hour work day results in an average pay rate of $10 per hour, a 50 percent discount from his promised $20 per hour piece-rate. The second technician forfeits to the employer the pay promised "by statute" under Labor section 223 because if his piece-rate pay is allocated only to piece-rate hours, he is not paid at all for his nonproductive hours.

*Id.* at 50. In *Gonzalez*, therefore, the state appellate court reasoned that Labor Code §§ 221 and 223 were violated because the employees forfeited this amount *directly* to the employer by virtue of the employer not paying them in accordance with statutory labor law. In contrast, the plaintiffs' allegation here is that the money was essentially stolen by their forepersons, who presumably kept it and did not return it to the employer, the defendants in this action. Accordingly, the court concludes that plaintiffs' argument that this claim could be premised on an alleged violation of Labor Code § 223 is simply not persuasive.

More importantly, however, all of these alleged violations of the law appear to require the employer to have knowledge of the unlawful payment scheme at issue. The AWPA requires that employers of seasonal agricultural workers provide employees written information concerning, among other things, the wages to be paid. 29 U.S.C. § 1821(a). Further, employers are prohibited from "*knowingly* provid[ing] false or misleading information" to the same employees. *Id.* § 1821(f) (emphasis added). Meanwhile, Labor Code § 1194 authorizes private civil suits by employees receiving less than the legal minimum wage or overtime compensation. As the

California Supreme Court has noted, "[a] proprietor who *knows* that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Martinez v. Combs*, 49 Cal. 4th 35, 69–70 (2010) (emphasis added).

Plaintiffs have come forward with no evidence indicating that defendants here had a company policy permitting, allowing, or encouraging the use of ghost workers by forepersons. Nor have they provided evidence that the majority of forepersons were engaged in this practice, from which it could perhaps be inferred the defendants had at least constructive knowledge of the activities of their forepersons. At most, plaintiffs have provided evidence that this practice occurred on the crews of thirteen different forepersons: Ramon Murillo, Eloy Molina, Elpidio Torres, Vicky Vargas, Porfidio Vargas, "La Chata," Guadalupe Cruz, Jilberto (LNU), "El Sapo," Juan Miramontes, Bartolo (LNU), Alejandro LNU, and Joaquin Murillo.[22] (Doc. No. 151 at ¶ 19(a).)[23] The parties do not dispute that defendants employed at least 109 different crews during the proposed class period which utilized this group piece rate system, suggesting there were at least 109 different forepersons active during the class period. Based on this, the court finds that there the evidence before it is insufficient to show that the alleged behavior affected

---

[22] Plaintiffs' evidence does not support a finding that this practice occurred on the crews of forepersons Enrique Garcia, Baltazar Ramirez, Bertha (LNU), or Reyna Ibanez. Gerardo Reyna declared that he worked for foreperson Garcia, but implicates only foreperson Vicky Vargas in any wrongdoing. (Doc. No. 145-5 at 6–7.) The same is true of the declaration of Ines Garcia in regards to foreperson Ibanez. (Doc. No. 145-6 at 65.) Similarly, the declarations provided by plaintiffs recount only that class members began working for forepersons Ramirez and Bertha (LNU) in 2015 and 2016. (Doc. No. 145-4 at 102; Doc. No. 145-6 at 65.) Plaintiffs have alleged that the payment structure for these crews changed from a group to an individual piece rate system starting in 2015, thereby preventing forepersons from using ghost workers.

[23] Plaintiffs note that while they do not believe every foreperson committed wage theft in this manner, they are unwilling to stipulate to a specific number of forepersons who committed such wage theft, because they have been provided with only limited contact information for class members. (Doc. No. 178 at 23–24.) The assigned magistrate judge in this action previously limited discovery relevant to these claims to 25 percent of the putative class members, unless plaintiffs uncovered from that sampling "evidence of company-wide violations." (Doc. No. 33 at 7.) Plaintiffs have not sought further discovery on this issue or brought a motion to compel for hearing by the magistrate judge, despite the prior order limiting discovery stating that this issue could be revisited if further evidence of class-wide violations was developed. (*Id.*)

most or even a substantial portion of defendants' crews. Absent that showing, the court is not persuaded that an inference can be drawn that defendants should have been aware that the ghost worker practice was widespread or occurring across all of its forepersons.

Given the above, any question of defendants' liability here would first require proof that each foreperson was engaged in the practice. Defendants do not agree that the above thirteen forepersons were engaged in this practice of wage theft via ghost workers, and instead assert only one foreperson—Ramon Murillo—ever engaged in it. (Doc. No. 181 at 20.) Indeed, defendants have provided declarations from crew members specifically stating that forepersons Bartolo (LNU), Vicky Vargas, Porfidio Vargas, and Eloy Molina did not engage in the use of ghost workers. (*See* Doc. No. 147-8 at 25–26 (Foreperson Bartolo (LNU); never saw or suspected ghost workers and believed she was paid correctly); *id.* at 107 (Foreperson Vicky Vargas); Doc. No. 147-9 at 25 (Fernandez) (Foreperson Porfidio Vargas); Doc. No. 147-11 at 70, 72–73 (Foreperson Eloy Molina).) These are factual disputes that would need to be resolved on a foreperson-by-foreperson basis.

Second, as suggested above plaintiffs would be required to prove that defendants knew their forepersons were engaged in this practice in order for defendants to be held liable. *See* 29 U.S.C. § 1821(f); *Martinez*, 49 Cal. 4th at 69–70. Some of plaintiffs' declarants indicate that putative class members generally complained about the ghost worker practices. (*See, e.g.*, Doc. No. 145-4 at 26 ("We began to complain to the company supervisors, but no one listened to us."); *id.* at 34.) Others do not. (*See, e.g.*, Doc. No. 145-6 at 5, 19–20, 58–59.) None of the declarations presented indicate how frequently, when, or the type of worker complaints that were lodged, nor who within the defendants' organizations they were lodged with. There is simply not sufficient evidence before the court to establish that these complaints were of such a nature that the defendants should have been on notice that *all* of its forepersons were potentially engaged in the practice of using ghost workers thereby causing actual employees to suffer injury.

Plaintiffs have also failed to identify any method of common proof that could be used to demonstrate the liability of the defendants across this subclass. Defendants are only potentially liable under the theories plaintiffs have alleged if their forepersons actually engaged in this

48

practice and if the company knew it. Plaintiffs have not demonstrated to the court's satisfaction that this can be accomplished in any way other than taking individualized testimony and engaging in a foreperson-by-foreperson determination of that supervisor's practices and defendants' knowledge of those practices. This would, in essence, require up to 109 separate proceedings to establish defendants' liability, if any, with respect to each of their forepersons. Common issues therefore do not predominate over individual ones here. Thus, certification is not warranted for this subclass. *See Zinser*, 253 F.3d at 1189 (upholding denial of certification where it was "inescapable that many triable individualized issues may be presented"); *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 219–20 (E.D. Cal. 2015) (finding common issues predominate where factual issues are "individualized, but subject to common determination by resort to the timekeeping records"); *Kurihara v. Best Buy Co., Inc.*, No. C 06-01884 MHP, 2007 WL 2501698, at *9 (N.D. Cal. Aug. 30, 2007) (noting that courts are frequently unwilling "to certify classes where individualized inquiries are necessary to determine liability," and collecting cases).

## 6. Tools Subclass

Plaintiffs seek certification of a subclass to correspond with their claim that defendants failed to provide all necessary tools for their employees to perform their jobs. (Doc. No. 145 at 56–60.) Defendants respond that they complied with the law in this respect because most of the tools plaintiffs identify are not necessary for the work to be performed and that commonality is lacking because of variances in tool practices among different work crews. (Doc. No. 147 at 57–59.)

### a. Commonality

Defendants phrase their objection to this subclass in terms of commonality, but in the court's view defendants' argument is better understood as an objection to predominance. Defendants do not dispute that there are common questions amongst this subclass, but rather argue that individual variances overwhelm them. (*See id.* at 59) ("Membership in this proposed subclass may only be ascertained after making the following individualized determinations . . ."). Therefore, the court will treat commonality as uncontested here. *See Dukes*, 564 U.S. at 359 (noting that "for purposes of Rule 23(a)(2) even a single common question will do") (internal

49

quotations and brackets omitted); *Hanlon*, 150 F.3d at 1022 (noting "commonality alone is not sufficient to fulfill" the predominance requirement, which requires that "common questions present a significant aspect of the case[,which] can be resolved for all members of the class in a single adjudication").

### b. Predominance

Under California law, "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." Cal. Labor Code § 2802(a). Moreover, "[w]hen tools or equipment . . . are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer," absent certain circumstances where the employee earns more than twice the minimum wage. 8 Cal. Code Regs. § 11140(9)(B). This requirement cannot be waived by the employee. *See Gattuso*, 42 Cal. 4th at 561 (citing Cal. Labor Code § 2804).

In support of their motion for certification of this subclass, plaintiffs' counsel has submitted a declaration stating that an inventory of the tools purchased shows that defendants bought the following tools in the relevant years: in 2011, four tree pruning shears and 1,093 grape clippers; in 2012, seven tree pruning shears and 1,200 grape clippers; in 2013, 112 tree pruning shears and 1,500 grape clippers; in 2014, zero tree pruning shears, 504 citrus clippers, and 1,300 grape clippers; and, in 2015, 252 tree pruning shears, 652 citrus clippers, and 4,274 grape clippers. (Doc. No. 145-1 at 14.) According to plaintiffs, defendants made "no significant purchases for repair or replacement parts for tools during the 2011 – 2015 period." (*Id.*) Further, defendants purchased 93 grape pruning shears in 2011, and never again purchased grape pruners during the four-year period involved. (*Id.*) Plaintiffs represent there was no record of defendants purchasing any cloth gloves, holsters, or files to sharpen tools. (*See* Doc. No. 145 at 56.) Additionally, plaintiffs state that there were many more employees who needed various tools than there were tools purchased. For instance, plaintiffs state defendants employ 1,200 to 1,600 citrus harvesters a year and yet bought no citrus clippers until 2014, and even then purchased only a total of 1,156 citrus clippers throughout both 2014 and 2015. (Doc. No. 145 at 57.) Defendants' PMK estimated at deposition that there were between 2,500 and 3,000 grape harvesters employed

by defendants during the 2015 season. (Doc. No. 145-1 at 102.) Plaintiffs point out that it was only in 2015 that the company first purchased enough grape clippers for every employee.[24]

Plaintiffs have also submitted declarations stating that numerous tools beyond those provided by defendants were required to perform the assigned work, including leather gloves, cloth gloves, files, oil, safety glasses, heavy-duty pruning shears, long pruning shears, picking shears, citrus clippers, harvesting scissors, sheaths, and various replacement parts. (Doc. No. 145-4 at 6 (Magdaleno); *id.* at 27 (Estrella); *id.* at 34 (Zepeda); *id.* at 41 (Vega); *id.* at 48 (Gonzalez); *id.* at 56–57 (Vargas); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.* at 87–88 (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia); Doc. No. 145-5 at 6 (Reyna); *id.* at 32 (Patron); *id.* at 41–42 (Carrera); *id.* at 47 (Melendres); *id.* at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 71 (Gutierrez); *id.* at 79 (Esquivel); *id.* at 87 (Reyes); *id.* at 94 (Machuca); *id.* at 107 (Sanchez); *id.* at 116 (de Sanchez); Doc. No. 145-6 at 6 (Sanchez); *id.* at 12–13 (Arteaga); *id.* at 18–19 (Orosco); *id.* at 25 (Orozco); *id.* at 31 (Saldana); *id.* at 37 (Cisneros); *id.* at 42 (Saldana); *id.* at 50 (Saldana); *id.* at 57–58 (Gonzalez); *id.* at 65–66 (Garcia); *id.* at 74 (Cabrales); *id.* at 79–80 (Hernandez); *id.* at 87–88 (Monzon).) These declarations also recount that the employees were forced to purchase each of these on their own, and were never reimbursed for them. Moreover, in the declarations it is reported that some of these items were actually sold to the putative class members by their forepersons. (Doc. No. 145-4 at 27 (Estrella); *id.* at 34 (Zepeda); *id.* at 64 (de Estrella); *id.* at 70 (Rojas); *id.* at 80 (Hinojosa); *id.* at 87–88 (Carranza); *id.* at 96–97 (Orozco); *id.* at 104–05 (Villafuerte); *id.* at 111–12 (Garcia); Doc. No. 145-5 at 41–42 (Carrera); *id.* at 47 (Melendres); *id.* at 56 (De Leon); *id.* at 65 (Alvarez); *id.* at 94 (Machuca); Doc. No. 145-6 at 57–58 (Gonzalez); *id.* at 79–80 (Hernandez); *id.* at 87–88 (Monzon).)

In 2015, defendants' policy concerning provision of tools changed. (*See* Doc. No. 145-1 at 482–85.) The policies adopted by defendants in 2015 contained forms that forepersons were to

---

[24] Defendants argue that they provided a sufficient number of tools for the class members to perform their jobs and therefore were in compliance with California law. (Doc. No. 147 at 58.) This is an argument going to the merits of plaintiffs' claim, rather than one relevant to whether certification of the subclass is appropriate.

have employees complete indicating whether they chose to use the employers' tools or declined

to do so, which tools they were using, and when they took them.  (*Id.*)

Defendants concede that some tools are necessary for certain jobs class members perform.

(*See* Doc. No. 145 at 58) (conceding hand clippers are necessary for mandarin and grape

harvesting).  However, defendants dispute whether other tools identified by plaintiffs are

necessary.  (*See id.*) (disputing whether cloth gloves, files, and holsters are necessary tools).

These two sets of tools—those of conceded necessity and those of disputed necessity—pose

different issues, though it is clear that common issues nevertheless predominate.  For the first set,

it is clear the only liability determination that will need to be made is whether defendants

purchased a sufficient number of concededly necessary tools.  For the second set, it is apparently

undisputed defendants bought none of these tools.  Instead defendants assert only that these tools

are not necessary to perform the work in question.  The sole liability issues to be determined with

respect to this subclass, therefore, are whether a given tool is necessary to perform a particular job

and whether a sufficient number of those tools were purchased by defendants.  Both of these

questions are suitable for determination across a wide number of employees, and will

predominate over any individual questions that may be present among this subclass.

### c.  *Superiority*

Further, a class action is clearly a superior vehicle for addressing this dispute.  There is no

demonstrated interest that class members have in controlling the litigation individually.  No

showing has been made that other cases concerning this subject matter are pending.  Because of

the predominance of common issues and the small amounts of damages in question, it is desirable

to concentrate the litigation in a class action.  Finally, there has been no showing of the presence

of difficulties that persuade the court that it will struggle to manage this subclass.  Therefore, the

following subclass is certified by the court:

Tools Subclass

All individuals who were employed by Defendants as a non-exempt
"field worker" or agricultural worker from March 17, 2011 to
present who purchased gloves, files, oil, safety glasses, shears,
clippers, scissors, sheaths, or replacement parts for their work for
Defendants.

7.     Unpaid Work Subclass

Plaintiffs seek certification of three separate subclasses posing primarily allegations that class members were not compensated for all of their work time:  the waiting time, pre-shift work, and post-shift work subclasses.  (Doc. No. 145 at 3.)  As referenced at the hearing on the pending motion for certification, the court believes these subclasses can be formulated into one subclass, rather than three separate ones, since they all involve allegations of the same legal injury, i.e., that employees were not compensated for time they spent working.  Accordingly, these subclasses will be addressed jointly below.

Plaintiffs allege that employees were required to spend time on work-related duties both before and after their shifts, and were regularly required to wait for trees to dry during their shifts before they could begin picking.  According to plaintiffs, the pre- and post-shift work included attending training sessions conducted by the defendants' forepersons, performing safety inspections, unloading and setting up equipment, and breaking down and stowing equipment.  None of this time was recorded.  Defendants oppose certification of this subclass because employees are not required to work off the clock, and any instances of individuals doing so are the exception not the rule.  (Doc. No. 147 at 59–61.)  The court finds that defendants' opposition, in essence, goes to the merits of plaintiffs' claims and fails to provide a rationale for why the subclass should not be certified.  Accordingly, the court will treat certification of this subclass as unopposed.  Nevertheless, because the court has an independent duty to ensure that the requirements of Rule 23 are met, *see In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 660 (S.D. Cal. 2010), it examines those requirements with respect to this subclass below.

*a.     Commonality*

The applicable wage order states that employers shall maintain records showing when employees begin and end each work period, as well as total hours worked and what the rate of pay was for each.  8 Cal. Code Regs. § 11140(7)(A); *see also* Cal. Labor Code §§ 1174(d) (requiring maintenance of records) and 226(a) (requiring employer to furnish employee a statement of total hours worked with each paycheck).  In California, employees must be compensated for each hour worked at least at the legal minimum wage, which cannot be arrived

at by averaging. *Bluford*, 216 Cal. App. 4th at 872; *Armenta*, 135 Cal. App. 4th at 324. The wage order defines "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." 8 Cal. Code Regs. § 11140(2)(G). Additionally, federal law requires employers to pay seasonal agricultural workers all wages owed when due. 29 U.S.C. § 1832(a).

Plaintiffs have submitted numerous declarations supporting their claims that this uncompensated work time was routine, with the declarants noting that they frequently worked fifteen to twenty-five minutes before a shift, ten to thirty minutes after a shift, and spent thirty minutes to two hours waiting for trees to dry, with each type of uncompensated work time occurring several times a week. (*See, e.g.*, Doc. No. 145-4 at 4–5 (Magdaleno); *id.* at 11–12 (Hinojosa); *id.* at 18 (Torres); *id.* at 24–26 (Estrella); *id.* at 32–33 (Zepeda); *id.* at 39–41 (Vega); *id.* at 46–48 (Gonzalez); *id.* at 54–56 (Vargas); *id.* at 62–63, 65 (de Estrella); *id.* at 71–72 (Rojas).) Thus, common legal questions such as whether defendants must compensate class members for the time at issue and common factual questions such as whether subclass members were required to arrive early or stay late or wait for trees to dry before working run throughout the subclass.

### b. Predominance

Additionally, the court must determine that common issues predominate over individual ones. As noted, common legal or factual questions run throughout this subclass. As indicated, defendants' primary objection to this subclass is based upon the contention that their employees were not required to work off the clock. To that end, defendants have provided numerous declarations from employees or former employees in which they state they were always compensated for time setting up and tearing down ladders, that they were called the day before and told to report to work late if the fruit was wet, that any training sessions always happened after they clocked in for work, and that on any occasions they might have arrived early to work they did so voluntarily and did not expect to be paid. (*See, e.g.*, Doc. No. 147-8 at 5 (Guzman); *id.* at 9–10 (Alvarez); *id.* at 14–15 (Amador); *id.* at 19–20 (Andrade); *id.* at 31–32 (Arteaga); *id.*

at 78–79 (Corona); *id.* at 85–86 (Cotino).) These arguments advanced by defendants, however, go to the *extent* of liability—i.e., the damages subclass members have suffered—not whether the subclass can establish liability on the part of defendants. As often stated herein, issues with respect to damages cannot prevent certification of this subclass. *Leyva*, 716 F.3d at 513–14 (holding individualized damages calculations do not defeat class certification); *Yokoyama*, 594 F.3d at 1094 (same).[25]

Additionally, there are numerous issues that are common to this subclass that will predominate during a merits determination. Aside from the general question of whether defendants were required to compensate class members for the time spent in training, setting up and tearing down work equipment, and waiting for fruit to dry prior to harvesting, at least one of the defenses defendants anticipate raising—whether individuals volunteered to come to work early—is one for which a subclass-wide determination is likely suitable. *See Alberts*, 241 Cal. App. 4th at 419 (noting a "nonexempt employee . . . may not lawfully volunteer to work off-the-clock without compensation"); *see also* Cal. Labor Code § 1194 (employee may file suit to collect minimum wage "[n]otwithstanding any agreement to work for a lesser wage"); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740–41 (1981) (noting minimum wage and overtime are non-waivable under the FLSA); *Gentry v. Superior Court of L.A. Cty.*, 42 Cal. 4th 443, 455 (2007) ("By its terms, the rights to the legal minimum wage and legal overtime compensation conferred by the [California] statute are unwaivable."). Moreover, employers are generally not liable for off-duty work being performed by their employees about which they have no knowledge. *Brinker*, 53 Cal. 4th at 1051; *Morillion* at 585. Thus, another crucial issue at the liability phase of this case is whether defendants had constructive knowledge of the activities of their agents, who were directing any unpaid work. *See, e.g.*, Restatement (Third) of Agency, § 5.03 (imputing notice of facts that an agent knows to principal). Finally, the liability

---

[25] Plaintiffs' expert Dr. Petersen notes that he will employ a surveying method for determining liability for the unpaid work time subclass. He anticipates, from reviewing a selection of the relevant declarations, class members would be able to both identify and quantify the amounts of unpaid time they worked in response to such a survey. (Doc. No. 145-3 at ¶¶ 29–30.) Since no surveying has yet been conducted, the question of whether this will be a sufficient measure of class-wide damages is not yet before the court.

determination for all shifts that were worked on a piece rate basis will undoubtedly be subject to common proof: if defendants were required to pay employees separately for this non-productive time and no non-productive time is noted in the payroll records, it would appear likely that liability will be established across the subclass.[26] For all these reasons, the court finds that common issues will predominate over individual ones with respect to this subclass.

### c. Superiority

The court also concludes that a class action will be a superior vehicle for the resolution of this dispute. As with the other subclasses, there has been no showing of any other individual suits being filed or any interest among class members of proceeding individually on these claims. Again, the size and number of the claims make it highly desirable to concentrate them into a single proceeding. Therefore, the following subclass is certified by the court:

> Unpaid Work Subclass
>
> All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who were required to arrive before their shift or perform duties after their shift, or wait for fruit to dry before beginning work.

### 8. Inaccurate Wage Statement Subclass

Plaintiffs seek certification of a subclass to contest violations of law due to the failure to provide itemized wage statements. California law requires employers to furnish to employees "an accurate itemized statement" which must be in writing and show the following:

> (1) gross wages earned, (2) total hours worked by the employee . . . (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section

---

[26] While the court is somewhat less certain whether shifts paid on an hourly basis will be subject to common proof, it does appear that some payroll records reflect hourly wage payments for non-productive time. (*See, e.g.*, Doc. No. 145-1 at 406.) Therefore, the court declines to differentiate this subclass between shifts paid on hourly and piece rate bases in ruling on the pending motion.

> 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . .

Labor Code § 226(a).  In addition, the statute provides that "a copy of the statement and the record of the deductions shall be kept on file by the employer for at least three years."  *Id.* Employees who can demonstrate a knowing and intentional failure by the employers to provide the above or to maintain records appropriately are entitled to statutory damages.  *Id.* § 226(e)(1).

Plaintiffs maintain that two different theories warrant certification of this subclass.  First, they argue that the violations detailed in the piece rate rest period, unpaid travel time, meal period, ghost worker, and off-the-clock work subclasses also reflect violations of the § 226 recordkeeping requirement as derivative claims.  (Doc. No. 145 at 65.)  To the extent that plaintiffs assert claims of § 226 violations as strictly derivative claims, the court sees no need to certify a separate subclass to address them.

Second, plaintiffs indicated at the hearing on the pending motion that their claims include allegations of independent, non-derivative violations of § 226:  namely, plaintiffs assert that defendants failed to maintain *any* records of itemized wage statements with respect to the putative class, and therefore did not retain the records for the three years required by state law.  (Doc. No. 145 at 64–65.)  At his deposition defendants' PMK appears to have conceded as much.  (*See* Doc. No. 145-1 at 59 (Rodriquez) ("We don't have the itemized wage statements or pay stubs.  We don't have copies of those pay stubs."); *see also id.* at 15 (noting that they keep payroll records, but that these do not have identical information as that which is included on a wage stub, which reflects more information).)  Further, defendants' counsel represented to plaintiff's counsel that their clients do not create paystubs themselves, and that the third-party service that does so maintains no copies of these records.  (*Id.* at 513) ("[W]e can only produce reports from Datatech that do not contain all of the itemized totals that appear on the paystubs.").

Defendants presented no argument in their briefing concerning why this subclass should not be certified.  At oral argument, defense counsel asserted that defendants were not required to maintain these records as a matter of law, and that defendants were only legally required to

57

provide such records to the employees.  Defendants' contention in this regard is a merits-phase argument that would apply to the entire subclass, and thus bolsters this court's conclusion that certification of this subclass is appropriate.

In short, there are common questions of fact and law that run throughout this subclass, those issues predominate, and a class action provides a superior vehicle by which to decide the disputes related to this subclass.  Accordingly, the following subclass is certified by the court concerning liability under § 226:

<u>Inaccurate Wage Statement Subclass</u>

> All individuals who were employed at any of the Defendants between March 17, 2012 and present as non-exempt field or agricultural workers for the Defendants.

9.      <u>Other Derivative Subclasses</u>

Plaintiffs also sought certification of several additional subclasses in order to bring claims that are purely derivative of other claims alleged here.  (Doc. No. 145 at 65–66.)  Defendants did not oppose certification of these derivative claims separately from the subclasses with respect to which they are derivative.  Class counsel explained at the hearing on the pending motion that such subclasses were unnecessary, and that the request was only included by plaintiffs out of an abundance of caution to ensure defendants did not later object.  The court sees no need to certify a separate subclass for claims that are purely derivative of claims relating to subclasses that have already been certified.  Any derivative claims may be brought on behalf of the appropriate subclass.  Therefore, certification of the derivative subclasses is denied.

**D.      Motion for a Trial Plan**

Finally, defendants filed a motion seeking an order requiring plaintiffs to submit a trial plan.  (Doc. No. 149.)  This motion essentially renews arguments previously decided when the court rejected the last such motion.  (*See* Doc. No. 77.)  For many of the same reasons previously expressed, the court once again denies defendants' motion for a trial plan.

As previously recognized by the court, a trial plan request is "properly raised after significant merits-phase discovery has taken place."  (*Id.* at 3.)  Plaintiffs are only required at the present stage of this litigation, to make the showing necessary to warrant class certification.  They

have sought to do so and the court has agreed with some of their arguments and rejected others, as set forth in detail above.  There is no requirement under the Federal Rules of Civil Procedure that plaintiffs submit a trial plan listing the items defendants have requested in their motion for a trial plan, and the court declines to read one into those rules.  *See Briseno*, 844 F.3d at 1126 ("Supreme Court precedent also counsels in favor of hewing closely to the text of Rule 23.").

Additionally, plaintiffs have moved for the award of sanctions under 28 U.S.C. § 1927 to require defense counsel to pay their fees and costs incurred in opposing the motion for a trial plan. (*See* Doc. No. 165 at 9–10.)  According to the statute relied upon by plaintiffs in this regard, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.  The Ninth Circuit has held that sanctions under this provision may be imposed for reckless conduct, while sanctions imposed under the district court's inherent authority require a bad faith finding.  *Lahiri v. Universal Music & Video Dist. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).  The Ninth Circuit has reversed the imposition of sanctions under § 1927 where the supposedly groundless issues raised were quickly dismissed, and "so . . . did not vexatiously multiply the proceedings," but in doing so has suggested that sanctions might be warranted if the offending attorney "file[d] repetitive motions or generate an extraordinary volume of paperwork." *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1189 (9th Cir. 2012).

As indicated at the hearing on these motions, the court is not inclined to impose sanctions at this time.  It is not quite accurate to say, as plaintiffs assert, that the court's prior order contained an "express instruction" to defendants not to file another motion for a trial plan until later in the case. (*See* Doc. No. 165 at 9–10; Doc. No. 167 at 9–10.)  Instead, the court noted in its prior order that "normally" such requests are "properly raised after significant merits-phase discovery has taken place."  (Doc. No. 77 at 3.)  Notwithstanding whether the court's statement in its prior order was an "express instruction," defendants' motion appears to pay little regard to the spirit or the clear import of the court's prior order, as no merits-phase discovery has yet taken place in this action.  Nonetheless, the court declines to impose monetary sanctions at this time.

59

However, defendants are warned that future motions for such a trial plan prior to the close of merits-phase discovery will likely result in the award of sanctions, absent a showing that the requested trial plan is required by law.  Simply put, plaintiffs are entitled to full discovery on their claims before being required to demonstrate how they will present their evidence at trial.

## CONCLUSION

For all of the reasons set forth above:

1. The court grants plaintiffs' motion for class certification (Doc. No. 145) in part, and the following subclasses are certified:

    a. <u>Piece Rate Rest Period Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and were compensated on a piece rate basis.

    b. <u>Unpaid Travel Time Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, and worked at two or more fields in one day.

    c. <u>Vehicle Expense Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, worked at two or more fields in one day, and drove their own cars between fields.

    d. <u>Meal Period Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present, for whom no meal period was recorded on at least one day in which the employee worked more than five hours.

    e. <u>Tools Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who purchased gloves, files, oil, safety glasses, shears, clippers, scissors, sheaths, or replacement parts for their work for Defendants.

    f. <u>Unpaid Work Subclass</u>

        All individuals who were employed by Defendants as a non-exempt "field worker" or agricultural worker from March 17, 2011 to present who were required to arrive before their shift or perform

duties after their shift, or wait for fruit to dry before beginning work.

    g.   Inaccurate Wage Statement Subclass

All individuals who were employed at any of the Defendants between March 17, 2012 and present as non-exempt field or agricultural workers for the Defendants.

2. Because the court separately certifies each of the above subclasses under Rule 23, the court denies certification of an overarching main class. Additionally, pursuant to Rule 23(b)(3), the court denies certification as to all other subclasses not specifically addressed in clause 1, paragraphs a through g above, particularly the Ghost Worker Crew Subclass and each of the subclasses proposed solely for the purpose of bringing a derivative claim;

3. The court denies plaintiffs' motion to certify any of the subclasses under Rule 23(b)(2) for the purpose of seeking injunctive relief based upon its conclusion that the named plaintiffs lack standing to seek injunctive relief;

4. The court finds plaintiffs Avalos and Aldapa to be adequate class representatives, and confirms them as class representatives for each of the certified subclasses, except for the Vehicle Expense Subclass, for which only plaintiff Avalos is a class representative;

5. The court finds plaintiffs' counsel to be adequate to represent the class in this proceeding, and the firms of Martinez, Aguilasocho, & Lynch APLC ("MAL") and Bush Gottlieb ALC are hereby confirmed as class counsel;

6. Defendants' motion for a trial plan (Doc. No. 149) is denied without prejudice to being re-raised following the conclusion of merits-phase discovery;

7. Plaintiffs' request for the imposition of sanctions under 28 U.S.C. § 1927 (Doc. No. 165) is denied;

8. The parties are directed to meet and confer promptly upon service of this order concerning the submission of a joint stipulated class notice and distribution plan, based on the subclasses as certified in this order. The parties shall file either a stipulated class notice and distribution plan or a notice that no stipulation can be reached within twenty-one (21) days of service of this order. If the parties cannot agree to a class notice or distribution

plan, plaintiffs shall submit a proposed class notice and distribution plan within thirty-five (35) days of service of this order. Defendants will have fourteen (14) days following plaintiffs' submission of a proposed class notice and distribution plan to file any objections thereto. Plaintiffs will have seven (7) days thereafter to submit a reply; and

9. This matter is referred back to the assigned magistrate judge for further scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated: __**January 24, 2018**__

_____
UNITED STATES DISTRICT JUDGE